**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Travelodge Hotels, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRAVELODGE HOTELS, INC., a Delaware Corporation, | Civil Action No. 15- |
| Plaintiff, | |
| v. | **VERIFIED COMPLAINT** |
| SEASIDE HOSPITALITY, LLC, a New Jersey Limited Liability Company; VILLAGE INN, LLC, a New Jersey Limited Liability Company; and SANDIP PATEL, also known as SANDIPKUMAR PATEL, an individual, | |
| Defendants. | |

Plaintiff Travelodge Hotels, Inc., by its attorneys, LeClairRyan, complaining of defendants, Seaside Hospitality, LLC, Village Inn, LLC, and Sandip Patel, also known as Sandipkumar Patel, says:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Travelodge Hotels, Inc. ("THI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.    Defendant Seaside Hospitality, LLC ("Seaside Hospitality"), on information and belief, is a limited liability company organized and existing under the laws of the State of New

Jersey, with its principal place of business at 300 Kimball Street, Woodbridge, New Jersey 07095.

3.     Defendant Village Inn, LLC ("Village Inn"), on information and belief, is a limited liability company organized and existing under the laws of the State of New Jersey, with its principal place of business at 980 Grove Avenue, Edison, New Jersey 08820.

4.     Defendant Sandip Patel, also known as Sandipkumar Patel ("Patel"), on information and belief, is the sole constituent member of Seaside Hospitality, the sole constituent member of Village Inn, and a citizen of the State of New Jersey, having an address at 980 Grove Avenue, Edison, New Jersey 08820.

5.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

7.     This Court has personal jurisdiction over Seaside Hospitality by virtue of, among other things, section 17.6.3 of the March 30, 2012 franchise agreement by and between Seaside Hospitality and THI (the "Franchise Agreement"), described in more detail below, pursuant to which Seaside Hospitality has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.     This Court has personal jurisdiction over Village Inn by virtue of its status as a limited liability company organized and existing under the laws of the State of New Jersey.

2

9.     This Court has personal jurisdiction over Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Patel acknowledged that he was personally bound by section 17 of the Franchise Agreement.

10.     Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Seaside Hospitality of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Travelodge® Marks

11.     THI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

12.     THI owns and has the exclusive right to license the use of the service mark TRAVELODGE and various related trade names, trademarks and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Travelodge® Marks"), as well as the distinctive Travelodge® System, which provides guest lodging services to the public under the Travelodge® name and certain services to its franchisees, including a centralized reservation system, advertising, publicity, and training services.

13.     THI or its predecessors first used the TRAVELODGE mark in 1939 and the Travelodge® Marks are in full force and effect.  Certain of the registered Travelodge® Marks are incontestable pursuant to 15 U.S.C. § 1065.

14.     THI has given notice to the public of the registration of the Travelodge® Marks as provided in 15 U.S.C. § 1111.

3

15.     THI uses or has used the names "Travelodge" and "Thriftlodge," among others, as abbreviations of its brand name.

16.     Through its franchise system, THI markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, THI allows its franchisees to utilize the Travelodge® Marks and to promote the Travelodge® brand name.

17.     THI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Travelodge® Marks as distinctly designating THI guest lodging services as originating with THI.

18.     The value of the goodwill developed in the Travelodge® Marks does not admit of precise monetary calculation, however because THI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of THI's goodwill is extremely significant.

19.     The Travelodge® Marks are indisputably among the most famous in the United States.

**The Agreements Between The Parties**

20.     Village Inn owns the guest lodging facility located at 306-314 Bay Boulevard, Seaside Heights, New Jersey 08751 (the "Facility").

21.     On January 3, 2012, Village Inn, as landlord, entered into a lease agreement for the Facility (the "Lease Agreement") with Seaside Hospitality, as tenant, for a twenty-year term.

22.     On or about March 30, 2012, THI entered into the Franchise Agreement with Seaside Hospitality for the operation of a 50-room Travelodge® guest lodging facility located at

4

the Facility and designated as Site No. 46431-01908-01 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as <u>Exhibit A</u>.

23.     Pursuant to section 5 of the Franchise Agreement, Seaside Hospitality was obligated to operate a Travelodge® guest lodging facility for a fifteen-year term, during which time Seaside Hospitality was permitted to use the Travelodge® Marks in association with the operation and use of the Facility as part of THI's franchise system.

24.     Pursuant to section 3 of the Franchise Agreement, Seaside Hospitality was required, among other things, to make renovations to the Facility, in order to bring the Facility into compliance with "System Standards," "Approved Plans," and/or a "Punch List," all of which were defined in or attached to the Franchise Agreement, and to achieve and maintain certain scores on periodic quality assurance inspections conducted by THI.

25.     Pursuant to section 3.2 of the Franchise Agreement, Seaside Hospitality was required to operate the Facility in compliance with the law and THI's "System Standards," as defined in the Franchise Agreement, including THI's quality assurance requirements.

26.     Pursuant to section 3.11 of the Franchise Agreement, Seaside Hospitality agreed that it would use reasonable efforts to protect, maintain, and promote the Travelodge® name, including its distinguishing characteristics. Further, Seaside Hospitality agreed it would not permit or allow its officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the goodwill or public image of the Travelodge® brand or system.

27.     Pursuant to sections 3.7 and 4.8 of the Franchise Agreement, THI had the right to conduct unlimited quality assurance inspections of the Facility (and unlimited reinspections if the

Facility received a failing score in the inspection) to determine whether the Facility was in compliance with THI's System Standard requirements.

28.     Pursuant to sections 7 and 18.1, and Schedule C of the Franchise Agreement, Seaside Hospitality was required to make certain periodic payments to THI for royalties, system assessment fees, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

29.     Pursuant to section 7.3 of the Franchise Agreement, Seaside Hospitality agreed that interest is payable "on any past due amount payable to [THI] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

30.     Pursuant to section 3.6 of the Franchise Agreement, Seaside Hospitality was required to prepare and submit monthly reports to THI disclosing, among other things, the amount of gross room revenue earned by Seaside Hospitality at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to THI.

31.     Pursuant to section 3.6 of the Franchise Agreement, Seaside Hospitality agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Seaside Hospitality agreed to allow THI to examine, audit, and make copies of the entries in these books, records, and accounts.

32.     Pursuant to section 11.2 of the Franchise Agreement, THI could terminate the Franchise Agreement, with notice to Seaside Hospitality, for various reasons, including (a) Seaside Hospitality's failure to remedy any default of its obligations or warranties under the Franchise Agreement within 30 days after receipt of written notice from THI specifying one or

more defaults under the Franchise Agreement, (b) if Seaside Hospitality does or performs, directly or indirectly, any act or failure to act that in THI's reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Travelodge® Marks or Travelodge® System, and/or (c) if Seaside Hospitality maintains or operates the Facility in a manner that endangers the health or safety of the Facility's guests.

33.     Pursuant to section 12.1 of the Franchise Agreement, Seaside Hospitality agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to THI in accordance with a formula specified in the Franchise Agreement.

34.     Section 18.2 of the Franchise Agreement specifically set liquidated damages for the Facility at $750.00 for each guest room of the Facility Seaside Hospitality was authorized to operate at the time of the termination of thc Franchise Agreement.

35.     Section 13 of the Franchise Agreement specified Seaside Hospitality's obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Travelodge® Marks.

36.     Pursuant to section 17.4 of the Franchise Agreement, Seaside Hospitality agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

37.     Effective as of the date of the Franchise Agreement, Patel provided THI with a Guaranty of Seaside Hospitality's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit B.

38.     Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the Franchise Agreement, he would "immediately make each payment and perform or cause [Seaside Hospitality] to perform, each unpaid or unperformed obligation of [Seaside Hospitality] under the [Franchise] Agreement."

39.     Pursuant to the terms of the Guaranty, Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by THI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

## The Defendants' Defaults and Termination

40.     By letter dated September 4, 2014, a true copy of which is attached hereto as Exhibit C, THI advised Seaside Hospitality that it had recently conducted a quality assurance inspection of the Facility and had discovered a number of safety issues at the Facility, including (i) broken or missing secondary locks, (ii) build-up on the windows and stairwells, (iii) poor lighting, (iv) buckled and wrinkled carpet by the pool.  Additionally, THI received information asserting that there were fire detectors hanging from the ceiling and non-functioning phones in the guestrooms at the Facility.  THI advised Seaside Hospitality that due to these safety issues (a) Seaside Hospitality was in default of its obligations under the Franchise Agreement, (b) it had 30 days within which to cure its default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

41.     On September 4, 2014, a criminal action entitled United States of America v. Sandipkumar Patel (the "Criminal Action") was instituted against Patel in the United States District Court, District of New Jersey, under Criminal Case No. 2:14-cr-00508, charging Patel with (1) conspiracy to defraud the United States, and (2) subscribing to a false tax return.  A copy of the Court's Information Statement is attached hereto as Exhibit D.

42.     Patel entered a plea agreement related to the Criminal Action in which he plead guilty to one count of conspiracy and one count of tax fraud.  A copy of the plea agreement is attached hereto as Exhibit E.

43.     On December 29, 2014, the news outlet www.nj.com published an article related to a number of hotels operating in Seaside Heights and referencing Patel's operation of five hotels in Seaside Heights, New Jersey, including the Facility.  The article noted Patel's guilty plea in the Criminal Action and stated that he continued to run the Facility while he was awaiting sentencing.  A copy of the article is attached hereto as Exhibit F.

44.     In addition to referencing Patel's criminal background, the article also noted that the Facility had been cited for health and safety hazards, including broken smoke detectors, missing carbon monoxide alarms, and electrical problems.

45.     By letter dated February 3, 2015 a true copy of which is attached as Exhibit G, THI terminated the Franchise Agreement, effective April 6, 2015 (the "Termination Date"), due to Seaside Hospitality's injurious and damaging actions, including the felony conviction of Patel, Seaside Hospitality's owner, which, in THI's reasonable judgment, materially damaged the goodwill associated with the Travelodge® Marks and Travelodge® System.  THI advised Seaside Hospitality that (a) it was required to de-identify the Facility within 10 days from the Termination Date, (b) it was required to pay to THI as liquidated damages for premature termination the sum of $37,500.00 as required under the Franchise Agreement, and (c) demand was made for all outstanding Recurring Fees through the date of termination.

46.     The termination of the Franchise Agreement precludes Seaside Hospitality from any further use of the Travelodge® Marks, and/or marks confusingly similar to the Travelodge® Marks, in or around the Facility.

47.    The termination of the Franchise Agreement precludes Seaside Hospitality from any further use of the Travelodge® Marks, and/or marks confusingly similar to the Travelodge® Marks, to induce the traveling public to use the Facility in any way.

48.    The termination of the Franchise Agreement precludes Village Inn, as landlord of the Facility, from any further use of the Travelodge® Marks, and/or marks confusingly similar to the Travelodge® Marks, in or around the Facility

49.    Since the termination of the Franchise Agreement, Seaside Hospitality and Village Inn have continued to use the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks, to induce the traveling public to rent guest rooms at the Facility.

50.    Since the termination of the Franchise Agreement, Seaside Hospitality and Village Inn continue to identify the Facility as a Travelodge® guest lodging facility without authorization.  Specifically, they have, among other things, (1) failed to remove Travelodge® signage, including signage using similar trade dress, color schemes, font, architectural features, and a confusingly similar name, specifically "Travel Inn", and (2) failed to remove its affiliation with Travelodge on third-party websites such as Tripadvisor.com.  A copy of the Facility's Tripadvisor.com profile as of June 24, 2015, including recent customer reviews, is attached hereto as Exhibit H.

51.    By letter dated May 27, 2015, a true copy of which is attached as Exhibit I, THI reiterated Seaside Hospitality's post-termination obligations under the Franchise Agreement, including the requirement that, upon termination, Seaside Hospitality completely "de-identify" the Facility as a Travelodge® guest lodging facility, including removal of all marks confusingly similar to the Travelodge® Marks, and also notified Seaside Hospitality's landlord, Village Inn, of the ongoing infringement at the Facility.

52.     Seaside Hospitality and Village Inn have continued to misuse the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks, despite receiving notification from THI to cease and desist from the misuse of the Travelodge® Marks.

53.     On June 2, 2015, judgment was entered against Patel in the Criminal Action. Among other obligations, Patel was sentenced to serve 30 months in prison.  He must surrender for service of the sentence at the institution designated by the Bureau of Prisons on August 3, 2015.  A copy of the Judgment is attached hereto as <u>Exhibit J</u>.

## **FIRST COUNT**

54.     THI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 53 of the Verified Complaint.

55.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

56.     Seaside Hospitality and Village Inn marketed, promoted, and rented, and continue to market, promote, and rent rooms at the Facility through the unauthorized use of the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

57.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any

11

word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

58.     The acts of Seaside Hospitality and Village Inn in marketing, promoting, and renting rooms at the Facility, through and with the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks, constitute:

        a)    a false designation of origin;

        b)    a false and misleading description of fact; and

        c)    a false and misleading representation of fact;

that caused and are likely to continue to cause confusion, or to cause mistake, or deception, as to the affiliation of the Facility with THI, and to cause confusion, or to cause mistake, or deception, to the effect that THI sponsors or approves of the guest lodging services that Seaside Hospitality and/or Village Inn provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

59.     Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

60.     Seaside Hospitality and Village Inn's use of the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks, in connection with goods and services at the Facility, after the Travelodge® Marks became famous, caused and will continue to cause dilution

and disparagement of the distinctive quality of the Travelodge® Marks, and lessened and will continue to lessen the capacity of the Travelodge® Marks to identify and distinguish the goods and services of THI, all in violation of Section 43(c) of the Lanham Act.

61.	Seaside Hospitality and Village Inn's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

62.	Seaside Hospitality and Village Inn's on-going acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on THI.

63.	THI has no adequate remedy at law.

64.	No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), THI demands judgment against Seaside Hospitality and Village Inn:

(a)	Preliminarily and permanently restraining and enjoining Seaside Hospitality and Village Inn, their affiliates, subsidiaries, officers, agents, servants, employees and attorneys, and all those who act in concert or participation with them, from marketing, promoting, or selling guest lodging services at the Facility through and with the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks, including signage using similar trade dress, color schemes, architectural features, and a confusingly similar name, specifically "Travel Inn"; and

(b)	Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

13

## SECOND COUNT

65.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 64 of the Verified Complaint.

66.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Seaside Hospitality agreed to allow THI to examine, audit, and make copies of Seaside Hospitality's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

67.     Seaside Hospitality has engaged in acts and practices, as described, which amount to infringement of the Travelodge® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

68.     As a result, Seaside Hospitality owes restitution and the disgorgement of profits, in an amount unknown to THI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Seaside Hospitality.

**WHEREFORE**, THI demands judgment ordering that Seaside Hospitality account to THI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks.

## THIRD COUNT

69.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 68 of the Verified Complaint.

70. Village Inn has engaged in acts and practices, as described, which amount to infringement of the Travelodge® Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

71. As a result, Village Inn owes restitution and the disgorgement of profits, in an amount unknown to THI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Village Inn.

**WHEREFORE**, THI demands judgment ordering that Village Inn account to THI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks.

## FOURTH COUNT

72. THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 71 of the Verified Complaint.

73. By letter dated February 3, 2015, THI terminated the Franchise Agreement, effective April 6, 2015, due to Seaside Hospitality's injurious and damaging actions, including the felony conviction of Patel, Seaside Hospitality's owner, which, in THI's reasonable judgment, materially damaged the goodwill associated with the Travelodge® Marks and Travelodge® System.

74. Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Seaside Hospitality shall pay liquidated damages to THI within 30 days of termination.

15

75.   Section 18.2 of the Franchise Agreement specifically set liquidated damages for the Facility at $750.00 for each guest room of the Facility Seaside Hospitality was authorized to operate at the time of the termination of the Franchise Agreement.

76.   As a result of the termination of the Franchise Agreement, Seaside Hospitality is obligated to pay THI liquidated damages in the amount of $37,500.00, as calculated pursuant to sections 12.1 and 18.2 of the Franchise Agreement.

77.   Notwithstanding THI's demand for payment, Seaside Hospitality has failed to pay THI the liquidated damages as required in sections 12.1 and 18.2 of the Franchise Agreement.

78.   THI has been damaged by Seaside Hospitality's failure to pay liquidated damages.

**WHEREFORE**, THI demands judgment against Seaside Hospitality for liquidated damages in the amount of $37,500.00, together with interest, attorneys' fees, and costs of suit.

### FIFTH COUNT

79.   THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 78 of the Verified Complaint.

80.   By virtue of the premature termination of the Franchise Agreement, THI sustained a loss of future revenue over the remainder of the fifteen-year term of the Franchise Agreement.

81.   If the Court determines that Seaside Hospitality is not liable to pay THI liquidated damages as required by sections 12.1 and 18.2 of the Franchise Agreement then, in the alternative, Seaside Hospitality is liable to THI for actual damages for the premature termination of the Franchise Agreement.

82.   THI has been damaged by Seaside Hospitality's breach of its obligation to operate a Travelodge® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, THI demands judgment against Seaside Hospitality for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

83.　　THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 82 of the Verified Complaint.

84.　　Pursuant to sections 7 and 18.1, and Schedule C of the Franchise Agreement, Seaside Hospitality was obligated to remit Recurring Fees to THI.

85.　　Despite its obligation to do so, Seaside Hospitality failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $19,440.50.

86.　　Seaside Hospitality's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged THI.

**WHEREFORE**, THI demands judgment against Seaside Hospitality for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $19,440.50, together with interest, attorneys' fees, and costs of suit.

## SEVENTH COUNT

87.　　THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 86 of the Verified Complaint.

88.　　At the time of the termination of the Franchise Agreement, Seaside Hospitality was obligated to pay THI Recurring Fees.

89.　　Despite its obligation to do so, Seaside Hospitality failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $19,440.50.

90.     In addition, Seaside Hospitality benefited from its wrongful use of the Travelodge® Marks after termination of the Franchise Agreement and paid no royalty or other Recurring Fees to THI in return for that benefit.

91.     Seaside Hospitality's failure to compensate THI constitutes unjust enrichment and has damaged THI.

**WHEREFORE**, THI demands judgment against Seaside Hospitality for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $19,440.50, and all royalties and other Recurring Fees that should be paid to compensate THI for the period during which Seaside Hospitality misused the Travelodge® Marks and was thereby unjustly enriched, together with interest and costs of suit.

## EIGHTH COUNT

92.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 91 of the Verified Complaint.

93.     Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the Franchise Agreement, he would immediately make each payment and perform each obligation required of Seaside Hospitality under the Franchise Agreement.

94.     Despite his obligation to do so, Patel has failed to make any payments or perform or cause Seaside Hospitality to perform each obligation required under the Franchise Agreement.

95.     Pursuant to the Guaranty, Patel is liable to THI for Seaside Hospitality's liquidated damages in the amount of $37,500.00, or actual damages in an amount to be determined at trial, and Seaside Hospitality's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $19,440.50, and for those additional Recurring Fees attributable to the period during which Seaside Hospitality has misused the Travelodge® Marks.

18

**WHEREFORE**, THI demands judgment against Patel for damages in the amount of:

(a)     All liquidated damages, or actual damages, and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit; and

(b)     All profits, royalties, and other Recurring Fees that should be paid to compensate THI for the period during which Seaside Hospitality misused the Travelodge® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

## NINTH COUNT

96.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 95 of the Verified Complaint.

97.     By letter dated February 3, 2015, THI terminated the Franchise Agreement, effective April 6, 2015, due to Seaside Hospitality's injurious and damaging actions, including the felony conviction of Patel, Seaside Hospitality's owner, which, in THI's reasonable judgment, materially damaged the goodwill associated with the Travelodge® Marks and Travelodge® System.

98.     Section 13.2 of the Franchise Agreement provides that, when the Franchise Agreement is terminated, THI has the right to "without prior notice enter the Facility, and any other parcels, . . . and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that [Seaside Hospitality has] not removed or obliterated within five days after termination."

99.     Seaside Hospitality continues to market, promote, and rent rooms at the Facility through the unauthorized use of the Travelodge® Marks, and marks confusingly similar to the

Travelodge® Marks, and such use caused and is likely to continue to cause confusion or mistake among prospective or actual customers.

100.    Seaside Hospitality's unauthorized use of the Travelodge® Marks has inflicted and continues to inflict irreparable harm on THI.

**WHEREFORE**, THI demands judgment declaring that THI, or its authorized agent, has the right, without prior notice to defendants, to enter the property at the Facility and remove any and all exterior signage, exterior items and other exterior materials displaying the Travelodge® Marks, and marks confusingly similar to the Travelodge® Marks, including signage using similar trade dress, color schemes, architectural features, and a confusingly similar name, specifically "Travel Inn".

LeClairRyan
Attorneys for Plaintiff
Travelodge Hotels, Inc.

By: _____
**Bryan P. Couch**

Dated: 7|16|15

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

LeClairRyan
Attorneys for Plaintiff
Travelodge Hotels, Inc.

By: _____
**Bryan P. Couch**

Dated: 7|16|15

## **VERIFICATION**

STATE OF NEW JERSEY    )
                             ) ss:
COUNTY OF MORRIS       )

Suzanne Fenimore, of full age, being duly sworn according to law, upon her oath, deposes and says:

I am Senior Director of Contracts Compliance for Travelodge Hotels, Inc., which is plaintiff in this action.

I have read the foregoing Verified Complaint and all the allegations contained therein. Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of THI or information available through employees of THI.

_____
**SUZANNE FENIMORE**

Sworn and subscribed to before
me this 7th day of July , 2015

_____
NOTARY PUBLIC

**CINDY J. O'CONNOR**
**Notary Public**
**State of New Jersey**
**⸱⸱ᵃⁱᵒⁿ Expires Feb. 13, 2020**

21

# EXHIBIT A



Location: **Seaside Heights, NJ**
Entity No.: **01908-01**
Unit No.: **46431**

## TRAVELODGE HOTELS, INC.
## FRANCHISE AGREEMENT

THIS Franchise AGREEMENT ("Agreement"), dated _March 30_ , 20 _12_ is between TRAVELODGE HOTELS, INC., a Delaware corporation ("we", "our" or "us"), and **SEASIDE HOSPITALITY LLC, a** _New Jersey_ **limited liability company** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1.   Franchise.**  We have the exclusive right to franchise to you the distinctive "Travelodge" System for providing transient guest lodging services.  We grant to you and you accept the Franchise, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a Travelodge. You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2.   Travelodge/Thriftlodge Franchisee Advisory Association.**

2.1 **Membership.**  You automatically become eligible to elect a representative from your region to the Travelodge/Thriftlodge Franchisee Advisory Association ("TTFAA") or any successor organization.   The board of TTFAA may consider and discuss common issues relating to advertising and operation of facilities in the System and make recommendations to us regarding such issues and other matters.  We may discontinue or restructure TTFAA or its successor at any time.

2.2 **Annual Conference.**  A Chain conference is held each year.  We will determine the conference date and location after consultation with the TTFAA board.  You will pay not less than one "Conference Registration Fee" for each Chain Facility you own.  When you pay the Conference Registration Fee, you may send your representative to the conference.  Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee.  You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3.   Your Improvement and Operating Obligations.**

3.1 **Pre-Opening Improvements.**  You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

3.2 **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other

1

related services of the Facility (including those specified on Schedule B) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. The Facility will follow standard industry practices for safeguarding cardholder information, applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility. You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

3.3 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.4 **Marketing.**

3.4.1 You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.4.2 You will participate in any regional marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.4.3 The Facility must participate in all mandatory Internet and distribution marketing

2

activities and programs in accordance with the System Standards Manual, including any arrangements we make with third party distribution channels. You shall provide us with information about the Facility and utilize our approved photographer for taking photographs of the Facility for posting on the Chain Websites. The content you provide us or use yourself for any Internet or distribution marketing activities must be true, correct and accurate, and you will promptly notify us in writing, in accordance with our processes that are then in effect, when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards.  You will discontinue any Internet or distribution marketing activities that conflict, in our reasonable discretion, with Chain-wide Internet or distribution marketing activities.  You must honor the terms of any participation agreement you sign for Internet or distribution marketing activities. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet or distribution marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis.  We may suspend the Facility's participation in Internet or distribution marketing activities if you default under this Agreement.

3.4.4   You will participate in the Wyndham Rewards program or any successor guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C. The Wyndham Rewards annual Front Desk Guide sets forth additional system standards, which you agree to follow.  The Front Desk Guide, including fees assessed and reimbursements rates, may be revised by us or our affiliates at any time upon 60 days prior notice.

3.5 **Governmental Matters.**   You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6 **Financial Books & Records; Audits.**

3.6.1   The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards.  You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.6.2   Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards.  We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date.  You need to inform

3



us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3   We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.6.4   You shall, at your expense, prepare and submit to us by the third day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require. You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time.

**3.7 Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we must return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys. We may, at our discretion, implement a chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable

4



third party.  You must provide free lodging for the inspector(s) when he/she visits your Facility.

3.8 **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Travelodge Hotels, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and their current and former subsidiaries, affiliates, successors and assigns as their interests may appear.  All policies must be primary and non-contributory with or excess of any insurance coverage that may be available to an additional insured.

3.9 **Conferences.**  You or your representative will attend each Chain conference and pay the Conference Registration Fee described in Section 2.2.  The Chain conference may be held as part of a Wyndham Hotel Group, LLC multi-brand conference with special sessions and programs for our Chain only.  Mandatory recurrent training for franchisees and general managers described in Section 4.1.4 may be held at a Chain conference.  The Fee will be the same for all Chain Facilities that we franchise in the United States.  We may invoice and charge you for the Conference Fee even if you do not attend the Chain Conference.  You will receive reasonable notice of a Chain conference.

3.10   **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve.  You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.11   **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Travelodge" or "Thriftlodge", as applicable, and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.  You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.  You shall use your best efforts to promote usage of other Chain Facilities by members of the public.  Except as provided in the System Standards Manual or if you obtain our prior written consent, which we may withhold in our sole discretion, neither your nor the Facility shall promote or advertise any competing business at the Facility including, but not limited to, any other guest lodging facility, time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business.

3.12   **Facility Modifications.**  You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

5

3.13    **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the systems Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.14    **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

3.15    **Technology Standards & Communications.**  You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment.  You must purchase the computer system and other equipment and software that we specify. We may modify System Standards to require new technology at all Chain Facilities. At our request, you shall participate in any intranet or extranet system developed for use in connection with the System. Such intranet or extranet system may be combined with that of our affiliates. You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things: (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system. You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

4.    **Our Operating and Service Obligations.**  We will provide you with the following services and assistance:

4.1 **Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) orientation training, remedial training, re-certification training, and supplemental training.

4.1.1    **General Manager Orientation Training.**  We will offer at our corporate offices or at another location we designate an orientation training program. The program will not exceed two weeks in duration and will cover such topics as operating a Chain Facility, marketing and sales, financial management and guest services. We may administer certain diagnostic tests via the Internet to measure the skill set of your general manager and, based in part of his/her score, offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date. Any replacement general manager must complete orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in orientation within the above time

6

frame, your general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for orientation which is payable as part of the Integration Services Fee set forth on Schedule D. If he/she does not attend orientation within 90 days after the Opening Date, and for any replacement general manager, you must pay a separate tuition at the rate then in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may charge you full or discounted tuition for "refresher" orientation for your general manager or for additional staff members who attend orientation with your general manager. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager (i) fails to register for and/or attend orientation by the required deadline, (ii) registers, but is a "no show", for orientation, or (iii) fails to notify us at least seven (7) days in advance that he/she will be unable to attend a scheduled program. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation See Section 4.1.5.

4.1.2   **Owner Training.** If this is your first System franchise, or you have not attended orientation within the last two (2) years, you (or a person with executive authority if you are an entity) must attend orientation by the Opening Date. If we do not offer a place in orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend orientation, but may choose to do so at their option. We charge you tuition of $1,500 which is payable before the scheduled date for the program. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least seven (7) days before the start date and schedule attendance at another class to be held within the required time period. We may charge you No-Show or Cancellation Fees if you (i) fail to register for and/or attend orientation by the Opening Date, (ii) register, but are a "no show", for any scheduled orientation program, or (iii) fail to give us at least seven (7) days notice of cancellation. See Section 4.1.5. In addition to No-Show and Cancellation Fees, if you do not attend orientation within 90 days after the Opening Date, you will still be required to attend orientation and pay tuition at the then in effect rate.

4.1.3   **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F +GX score on Medallia electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our customer care department, as determined by us in our sole discretion. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. The training may be in the form of one or more classes held at different times and locations as we may require. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. In addition, if at the time of your initial post-opening quality assurance inspection, you receive (i) a failure rating on guest room cleanliness and (ii) an average Medallia score of F on cleanliness of guestroom category or cleanliness of bathroom category (based on a minimum of 10 electronic Medallia guest surveys), then we may require you to take a one day, on-site remedial class on housekeeping within 60 days after the inspection. The tuition for this class is currently, $ 800, but is subject to increase in the future.

4.1.4   **Supplemental Training.**   You must subscribe to our e-learning modules and other

7

educational resources, accessible by you and your staff via the Internet, and pay us the annual fee for this service. All general managers must complete recertification training at such intervals as we may establish in the System Standards Manual. You must pay us the tuition then in effect for the program. We may offer other mandatory or optional training programs for reasonable tuition or without charge. Recertification and other supplemental training may be offered in our corporate offices or other locations or held in conjunction with a Chain lodging conference. You must pay the then current tuition for the training as well as for your representative's travel, lodging, meals, incidental expenses, compensation and benefits while attending the training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5   **No Show and Cancellation Fees.** If you, your general manager, or any other member of your staff you designate, registers for a training program but fails to attend such program within the required time period, or fails to attend a training program as scheduled without notifying us in advance, we may charge you a No-Show Fee of 50% of the tuition for the program. If you, your general manager or any other member of your staff does not register for and attend any required training within the time period set forth in this Section 4.1 or in the System Standards Manual, we may charge you a fee of 100% of the tuition for the program. If you or any member of your staff cancels participation in any training program less than seven (7) days before it is scheduled to be held, we may charge you a Cancellation Fee of 25% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2 **Reservation System.** We will operate and maintain (directly or by contracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use Basic Reservation Fees we collect as part of the System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance and support for any software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or an affiliate. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation. The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology. All information you collect or capture through your property management system shall be jointly owned by you and us. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

4.3 **Marketing.**

4.3.1   We will use Marketing Contributions we collect as part of the System Assessment Fees to promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be

8

reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the Marketing Contributions to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee.

4.4 **Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation wherever it appears.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium. We will provide you with access to the System Standards Manual promptly after we sign this Agreement. We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We

9

have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.7. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.6. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

5.  **Term.**  The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the fifteenth (15th) Franchise Year. However, each of us has the right to terminate this Agreement, without cause, and as a matter of right, on the 7th or 12th anniversary of the Opening Date by giving prior written notice to the other, provided that if you decide to exercise your right to terminate this Agreement, you must have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of a property management system or Reservation System) as of the date you provide notice of termination and as of the effective date of the termination.  The written notice required by this Section 5 shall be given at least 6 months, but not more than twelve (12) months, before the date of the proposed termination.  You will pay no Liquidated Damages if you comply with the terms of this Section and you perform the post termination obligations specified in this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.  **Application and Initial Fees.**   You must pay us a non-refundable Application Fee of $1,000.00.  If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee.  If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee.  The amount of your Initial or Relicense Fee is **$10,000.00** which shall be paid when you sign this Agreement and is fully earned when we sign this Agreement.

7.  **Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States).  The Recurring Fees described in Section 7.1 are payable three days after the month in which they accrue, without billing or demand.  Other Recurring Fees are payable at the times set forth in the System Standards. Recurring Fees include the following:

7.1.1   A "Royalty" equal to four and five-tenths percent (4.5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2   A "System Assessment Fee" as set forth in Schedule C including a "Marketing Contribution" and a "Daily Guest Room Charge" for advertising, marketing, training and other related services and programs, and a "Basic Reservation Fee" for the Reservation System, accrues from the Opening Date until the end of the Term, including during reservation suspension periods. We collect and deposit these Fees from franchisees, then disburse and administer the funds collected by means of a separate account or accounts.  We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.  You will also pay or

10



reimburse us as described in Schedule C for "<u>Additional Fees</u>" such as commissions we pay to travel and other agents for certain reservation and marketing services to generate reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Chain Websites and/or other reservation systems, distribution channels and networks, and fees for additional services and programs. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C.

7.2 You will pay to us "<u>Taxes</u>" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "<u>Interest</u>" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a Transfer occurs, your transferee or you will pay us our then current Application Fee and a "<u>Relicense Fee</u>" equal to the Initial Fee we would then charge a new franchisee for the Facility.

7.5 You will report and pay to us all Recurring Fees and other fees and charges on-line via our self-service Electronic Invoice Presentment and Payment tool ("E.I.P.P") accessible through our Chain intranet. In the E.I.P.P. on-line environment, payments can be made either through the electronic check payment channel or the credit card payment channel. We reserve the right to change, from time to time, the technologies or other means for reporting and paying fees to us by amending the System Standards Manual.

## 8. Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the

11



Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

### 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your Franchise is subject to termination when the Transfer occurs. The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a Franchisee in our sole discretion, given



the circumstances of the proposed Transfer, provide the same supporting documents as a new Franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may, in our discretion, require the transferee to place funds in escrow, at its expense, in order to complete all necessary renovations. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on one or more of the following:  limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

**9.4 Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5 Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6 Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and owner ship percentages of your owner(s) at our request.

**10. <u>Our Assignments</u>.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed

13



our obligations under this Agreement except those that arose before we assign this Agreement.

## 11. Default and Termination.

11.1     **Default.**  In addition to the matters identified in Sections 3.1 and 3.6 you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement.  If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2.  We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed.  In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection.  If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection.  We may terminate this Agreement and any or all rights granted hereunder if you do not perform that improvement agreement.

11.2     **Termination.**  We may terminate the this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Travelodge" or "Thriftlodge," as appropriate, (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3     **Casualty and Condemnation.**

11.3.1     You will notify us promptly after the Facility suffers a Casualty that prevents you from

14

operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2 You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3 Any protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4 **Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue reservation referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All System Assessment Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. We may omit the Facility from any paper or electronic directory of Chain Facilities that we issue. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults. Once a termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may cease accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date including or following the termination or expiration of this Agreement.

11.5 **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

TRA FA CON
247079 Q3/11

## 12. Liquidated Damages.

12.1    **Generally.**  If we terminate the Franchise under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination.  If Termination occurs during the last two Franchise Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.2, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment.  Before the last two Franchise Years, Liquidated Damages will be **as set forth in Section 18.2.**  If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable after the Opening Date.  Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement.  Our right to receive other amounts due under this Agreement is not affected.

12.2    **Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees  for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires.  This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority).  You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

## 13. Your Duties At and After Termination.    When a Termination occurs for any reason whatsoever:

13.1    **System Usage Ceases.**   You must comply with the following "de-identification" obligations.  You will immediately stop using the System to operate and identify the Facility.  You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual or other brand directives for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.  If you do not strictly comply with all of the de-identification requirements above, in the System Standards Manual and in our other brand directives, you agree to pay us a Royalty equal to $2,000 per day until de-identification is completed to our satisfaction.

13.2    **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination.  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4.  We may notify third parties that the Facility is no

16

longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours. If you have not completed your de-identification obligations to our satisfaction, we may paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3    **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4    **Survival of Certain Provisions.** Sections 3.6 (as to audits, for 2 years after termination), 3.11, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement.

**14. Your Representations and Warranties.**    You expressly represent and warrant to us as follows:

14.1    **Quiet Enjoyment and Financing.**    You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2    **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your

17

knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3    **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

### 15. Proprietary Rights.

15.1    **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2    **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

15.3    **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4    **Confidential Information.**    You will take all appropriate actions to preserve the confidentiality of all Confidential Information.   Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.   You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other

18

alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5    **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6    **The Internet and other Distribution Channels.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent. You will assign to us any such identification at our request without compensation or consideration. You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent. You must make available through the Reservation System and the Chain Website all rates you offer directly to the general public or indirectly via Internet marketing arrangements with third parties. You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet or distribution marketing materials must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

16. **Relationship of Parties.**

16.1    **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not

19

limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2   **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

**17. Legal Matters.**

17.1   **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect.  If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2   **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3   **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, (iii) by first class, prepaid certified or registered mail, return receipt requested, (iv) by electronic mail, posting of the notice on our Chain intranet site or by a similar technology; or (v)  by such other means as to result in actual or constructive receipt  by the person or office holder designated below, to the appropriate party at its address stated below or as it may otherwise designated by notice.  The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us.  Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

TRAVELODGE HOTELS, INC.:
Our address: 22 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. (973) 753-8311

Your name: **SEASIDE HOSPITALITY LLC**
Your address: **300 Kimball Street, Woodbridge, NJ 07095**
Attention: **Sandip Patel;**
Your fax No.: **N/A;**
Your e-mail address: **P_sandip@hotmail.com**

17.4   **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any

20

remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5    **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6    **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4  **WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5  Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action.  You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

17.7    **Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

17.7.1  **You received our Franchise Disclosure Document for prospective franchisees ("FDD") at least 14 days before signing this Agreement and paying any fee to us.**

17.7.2  **Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement**

21

or in the FDD.

17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise other than those set forth in the FDD.

17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement.

17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

17.8     Force Majeure.  Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from:  (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism, or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected.  Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

17.9     Protected Territory.  We will not own, operate, lease, manage, franchise or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate franchises or licenses the facility, and/or (ii) any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed.  You acknowledge that the Protected Territory fairly represents the Facility's trading area, and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section.  You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility

TRA FA CON
247079  Q3/11

on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **all the area within a circle created by a one (1) mile radius whose centerpoint is the front door of the Facility.**

18.     **Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1 .  **Combined Fees**. Notwithstanding Section 7.1, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement**, you will pay a Combined Fee consisting of the Royalty and System Assessment Fee (which is comprised of a Marketing Contribution, Daily Guest Room Charge and Basic Reservation Fee) at the rates set forth in this Section. The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement. The discount from the Royalty and System Assessment Fees set forth in Section 7 that the Combined Fee represents (the "Discount Amount") shall first be applied to the Basic Reservation Fee and any remaining Discount Amount shall be applied evenly between the Royalty and Marketing Contribution.

18.1.1  The Combined Fee commencing on the Opening Date and continuing for the first three Franchise Years shall be (i) **forty two** dollars (**$42.00** ) per guest room per month May 1st through September 14th and (ii) **forty two** dollars (**$42.00** ) multiplied by 25 guest rooms per month September 15th through April 30th. If you should open the Facility on any day other than the first day of the month, you will pay a prorated amount beginning on the Opening Date and ending on the last day of the month in which the Opening Date occurs; and

18.1.2  The Combined Fee for the fourth and fifth Franchise Years shall be (i) **fifty dollars ($50.00)** per guest room per month May 1st through September 14th and (ii) **fifty**  dollars (**$50.00** ) multiplied by 25 guest rooms per month September 15th through April 30th;  and

18.1.3  The Combined Fee for the fifth and sixth Franchise Years shall be (i) **fifty eight** dollars (**$58.00)** per guest room per month May 1st through September 14th and (ii) **fifty eight**  dollars (**$58.00** ) multiplied by 25 guest rooms per month September 15th and continuing through April 30th; and

18.1.4  The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the seventh Franchise Year.

18.1.5  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and

23



you fail to cure the default within the time specified, if any, in the notice of default, or (ii) ~~after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 200 in a re-inspection to be performed not less than 60 days after the initial inspection.~~(intentionally stricken)

18.2 **Liquidated Damages.**  Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two Franchise Years will be Seven Hundred Fifty Dollars ($750.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

18.3 **Reduced Relicense Fee.**  If (i) you are not then in default under this Agreement, (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, and (iii) we receive the Franchise Application before the end of the third Franchise Year, then the Relicense Fee for a Transfer will be $5,000.00.  If the conditions are not satisfied, and after the third Franchise Year, the Relicense Fee will be as specified in Section 7.4.

remainder of page intentionally left blank

24

IN WITNESS WHEREOF, the parties have executed this Agreement on this _30th_ day of _March_, 20 _12_ and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.

WE:
TRAVELODGE HOTELS, INC.

By: _____
Vice President

YOU, as franchisee:
**SEASIDE HOSPITALITY LLC**

By: _____
(Managing) Member

25

TRA FA CON
247079 Q3/11

# APPENDIX A

## DEFINITIONS

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D.

Basic Reservation Fee means the fees set forth in Section 7.1.2 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Chain Websites means any current or future consumer or business websites, mobile websites or mobile applications that we or our affiliates develop for booking reservations for and/or providing information about Chain Facilities, and any future equivalent technology.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual Chain conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence.   Confidential Information includes all other system standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the property management system software and other applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

26

Directory means any general purpose directory we issue, whether printed, web-based, or issued in another medium, which may list the names and addresses of Chain Facilities in the United States, and at our discretion, other System facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Franchise means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

Franchise Year means:

27



(i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest (sleeping) rooms at the Facility, including all credit transactions, whether or not collected, guaranteed no-show revenue net of chargebacks from credit card issuers, and any proceeds from any business interruption or similar insurance applicable to the loss of revenues due to the non-availability of guest rooms. Excluded from Gross Room Revenues are **separate** but excluding separate charges to guests for Food and Beverage, room service, actual telephone charges, key forfeitures and entertainment (including Internet fees and commissions); vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6, if the Agreement is for a new construction or conversion franchise.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **314 Bay Boulevard, Seaside Heights, NJ 08751**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marketing Contribution means the fee you pay to us under Section 7.1.2 and Schedule C, as

28

amended, for advertising, marketing, training and other services.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Travelodge" or "Thriftlodge", the "Sleepy Bear" logo and other marks (U.S. Reg. Nos. 1,474,602; 1,869,185; 1,868,724; 1,879,457; 1,539,812; 848,208; 1,868,761; 1,001,682; 1,006,905) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.14.

Opening Date has the meaning specified in Schedule D.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Prototype Plans has the meaning specified in Schedule D for New Construction Facilities.

Punch List means the list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3.1 and Schedule D.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee pays to us when a Transfer occurs, or the fee you pay to us if you are renewing an existing franchise.

TRA FA CON
247079 Q3/11

Reinspection Fee means the fee you must pay to us under Section 3.7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Reservation System or "Central Reservation System" means the back end technology platform and applications used by us to accept, store and/or communicate reservations for Chain Facilities. The Reservation System is separate from, but enables, the booking of reservations for Chain Facilities through various distribution channels such as the Chain Websites, the GDS and other distribution channels.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fees means the assessments charged as set forth in Section 7.1.2.

System Standards means the standards for participating in the System published in the System Standards Manual or elsewhere, including but not limited to design standards, FF&E standards, Marks standards, marketing standards, operations standards, technology standards and maintenance standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual or written directive or communication we issue or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Travelodge Hotels, Inc., a Delaware corporation, its successors and assigns.

31

## SCHEDULE A

(Legal Description of Facility)

## SCHEDULE B

PART I:     YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| **Sandip Patel** | 100% | **Managing Member** | |

PART II:     THE FACILITY:

Primary designation of Facility: **Travelodge**

Number of approved guest rooms: **50**

Parking facilities (number of spaces, description): **55**

Other amenities, services and facilities: **Outdoor Pool**

Initial

TRA FA CON
247079 Q3/11

**TRAVELODGE HOTELS, INC.**
**SCHEDULE C**
**April 2011**

I.      **System Assessment Fee**

The System Assessment Fee includes the Marketing Contribution, the Daily Guest Room Charge and the Basic Reservation Fee. The Marketing Contribution is equal to two percent (2%) of Gross Room Revenues. The Daily Guest Room Charge is ten cents ($.10) per available guest room per day for the first 100 rooms and five cents ($.05) per available guest room per day for each additional room of the Facility. The Basic Reservation Fee is 2% of Gross Room Revenues. We reserve the right, in our sole discretion, to increase or modify the System Assessment Fees for all Chain Facilities from time to time to cover costs (including reasonable direct or indirect overhead costs) related to the services and programs referenced in Section 7.1.2 after consultation with the TTFAA board

II.     **Additional Fees**

A.      **Loyalty Program Charge**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "Qualifying Stay" at the Facility as defined in the Front Desk Guide or any other program rules, which are System Standards. We will proactively match and award members with points or other program currency they earn on Qualifying Stays even if they do not present their Wyndham Rewards membership card upon check-in. You will be billed monthly in arrears for points or other program currency awarded to members during the preceding month.

B.      **Customer Care Fee**

We will contact you if we receive any guest complaint about you or the Facility and you will be responsible for resolving the complaint to the satisfaction of the guest. We may also contact you, at our discretion, if we become aware of any other complaints about the Facility including complaints which are posted on third-party travel websites, distribution channels, blogs and social networks, or other forums. If you do not respond to and resolve any complaint to the guest's satisfaction within three business days after we refer it to you, we will charge you a "Customer Care Fee" of $160.00, plus the costs we incur to settle the matter with the guest. The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

C.      **Best Available Rate Program**

You must (i) make available through the Central Reservation System and the Chain Websites room rates equivalent to those you offer to the general public directly or indirectly via third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published

34



requirements.  If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through any of the Chain Websites or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the applicable night(s) to the guest at 10% less than the lower rate offered on the Internet. You may collect standard incidental fees, charges and taxes.  We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

D.     **Service Interruption Fee**

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us the Service Interruption Fee set forth in the System Standards before we restore service.

E.     **GDS and other Distribution Channel Fees**

We will charge you either a GDS Fee or a Distribution Channel Fee, as applicable, for qualified reservations for your Facility processed through the global distribution systems ("GDS") or through another distribution channel, including an on-line travel agency, our Chain Websites or our direct connections to other electronic channels.  GDS Fees are assessed for reservations processed through any GDS or through any Internet website or other booking source powered by a GDS.  Distribution Channel Fees are assessed for qualified reservations originated through all other on-line distribution channels. If a guest cancels a GDS-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable GDS Fee.  This does not apply to reservations originated and canceled through other distribution channels.  GDS and Distribution Channel-originated reservations may also incur agent and similar commissions.  We will establish the amount of the GDS and Distribution Channel Fees from time to time based on a weighted average of the fees these channels charge us and/or our own costs (including overhead) for providing these services.  Distribution Channel Fees may vary by distribution channel.

F.     **Agent Commissions and Other Charges**

You must pay and/or reimburse us up to 15% of the Gross Room Revenues from qualified reservations booked by "Agents" or other qualifying originators, plus our service charge of .75% of commissionable revenue. "Agents" include, but are not limited to, travel agents, on-line travel and referral websites, travel consortia, travel management companies, global sales agents and other third party distribution channels.  These payments may be allocated to commissions charged by the Agents or to paid search and/or other marketing activities conducted or to be conducted by or through these Agents on a going forward basis.

We or an affiliate may charge you a sales commission of up to 15% of the Gross Room Revenues generated from qualified reservations consumed by members of affinity groups and organizations participating in our Member Benefits Program.  We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits Program to its members and distributes the remaining portion to our Global Sales Organization to offset its administrative and overhead costs for supporting the Member Benefits Program and other programs for generating room nights at Chain Facilities.

35

 

Under our G.O. Leads Plus Referral Program, our Global Sales Organization refers leads for reservations from groups, government, business travelers, specialty markets, travel management companies and consortia, and other sources to Chain Facilities. One source of reservations are leads from other Chain Facilities. For this business, we or an affiliate charges you a sales commission of 10% of the Gross Room Revenues on qualifying reservations. We or our affiliate pays 7% of the sales commission to the referring Chain Facility and distributes the remainder to our Global Sales Organization to offset its administrative and overhead costs for supporting the G.O. Leads Plus Referral Program and other programs for generating room nights at Chain Facilities.

We will offer you the opportunity to participate in certain Internet and distribution channel marketing and reservation activity with third parties. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates, but a commission of up to 15% may be charged on consumed room nights.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services, programs and distribution channels at any time upon not less than 30 days written notice.

36

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

This Addendum applies if you are converting an existing guest lodging facility to a Travelodge Facility.

### 1.  YOUR IMPROVEMENT OBLIGATION:

1.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and the renovations specified on any Punch List attached to this Schedule D is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans, and the Punch List. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our discretion, require you to place funds in escrow, at your expense, in order to complete all necessary renovations. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 1.3 below and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it. We may grant you an extension of time to complete the items on your Punch List in our sole discretion. The grant of an extension to perform your Improvement Obligation will not waive any other default existing at the time the extension is granted.

1.2 **Improvement Plans.** You will create plans and specifications for the work described in Section 1.1 of this Schedule D (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during



or after renovation or construction.  Any material variation from Approved Plans requires our prior written approval. We may offer to provide you or your architect with interior design or other prototypes.  If you decline to utilize such prototype(s) in developing the Facility, we may charge you a fee for reviewing your custom plans and designs.  We may offer other optional architectural and design services for a separate fee.  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request.  We inspect the work while in progress without prior notice.

1.3 **Pre-Opening**.  You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our written approval or as permitted under and strictly in accordance with the System Standards Manual.  If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Section 1.1 of this Schedule D and Sections 11.2 and 11.4 of the Agreement, you will begin paying the Royalty to us, as specified in Section 7.1 from the date you identify or operate the Facility using the Mark.  We may delay the Opening Date until you pay the Royalty accruing under this Section.

1.4 **Integration Services.**  We will provide the following "Integration Services" to assist you in opening the Facility.  We will provide training through various on-line courses on subjects such as Quality Assurance/Medallia, Wyndham Resources, housekeeping, preventative maintenance, customer service, and the RFP process.  A member of our field team will also visit the Facility to provide on-site training in various operational issues including, but not limited to, the System Standards, using the Chain's intranet site, and revenue management principles. We will deliver to you an initial supply, as determined by us in our reasonable discretion, of certain Mark-bearing guest room products.  We will arrange to have digital photographs taken of the Facility in accordance with System Standards which will be suitable for posting on our Chain Websites and third party travel websites and will be owned by us.  If we allow you to open the Facility before your installation of permanent signage, we will arrange for one of our approved suppliers to provide temporary signage for the Facility in the form of a Mark-bearing bag to cover your primary free standing sign.  If you install permanent signage from an approved supplier for the Facility on or before the Opening Date, or if within thirty (30) days of the Opening Date, you sign a quote and pay the required deposit for permanent signage from the vendor assigned to provide temporary signage for the Facility, we shall issue you a credit of $1,000 against the Integration Services Fee. We will provide orientation training for your general manager as set forth in Section 4.1 of the Agreement if he/she attends the training by the deadline set forth in Section 4.1.

1.5 **Integration Services Fee.**  You will pay a non-refundable "Integration Services Fee" of $4,600.00 on or before the Opening Date.

2. **DEFINITIONS:**

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

38

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

**[Punch List Attached.]**

TRA FA CON
247079 Q3/11



## Travelodge Hotels, Inc.
## PROPERTY IMPROVEMENT PLAN REPORT

## Village Inn
## Seaside Heights, NJ

## Conversion To
## Travelodge
### March 15, 2012



## ...N REQUIREMENTS & SUBMITTAL PROC...S

Please submit all design plans and specifications to the Global Design Department (interior.design@wyn.com) for review and approval prior to purchasing or starting renovations. All renovations must meet Brand Standards, any items purchased or renovated without approval may need replacement if they do not meet brand design standards.
or noted.

## OVERVIEW

The PIP identifies specific items which we inspected at the Facility which were not in compliance with brand standards and need to be corrected. It is the responsibility of the Owner/Franchisee to review the Brand Standards Manual for a complete description of all standards and to maintain Brand Standards for any areas of the property that are not specifically covered in this PIP. In addition, you are responsible for ensuring that the Facility is constructed, improved, maintained and operated in compliance with all applicable federal, state and local laws, codes, ordinances and regulations, including but not limited to, the Americans with Disabilities Act and its Accessibility Guidelines. This PIP was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet brand standards or comply with law or, at our discretion, if the condition of the Facility changes materially since the inspection date or if the brand standards change.

All items in this PIP are required to be completed no later than the timeframes noted. Time extensions in no way imply a waiver. Failure to comply with specified deadlines for completing items may result in default under your license or franchise agreement and reservation service suspension. All items will continue to be evaluated on condition, appearance and adherence to brand standards through periodic quality assurance inspections. Any items on a future quality assurance inspection that do not meet brand standards will be required to be remedied. Failure to maintain acceptable levels of condition and appearance and adherence to brand standards may be grounds for default under the Franchise or License Agreement.

The Brand Standards reference provided within this PIP is to help guide you in finding the details of the standards you are required to comply with as part of this PIP. The reference provided is in no way complete instructions on the work required to fulfill the PIP requirements. Prior to the commencement of all work you are required to ensure you are complying with the most current standards. Please consult your Development Director or noted department with specific questions to comply with the requirements contained in the PIP.

By signing this PIP, I acknowledge and agree that select pieces of this PIP may be provided to our approved vendors for the purpose of their offering you products and services that are required to complete this PIP. Only information necessary for the vendor to offer their products and services will be provided, including contact information, property address, number of rooms, brand converting to, and a list of items related to necessary or required products and services

ONLY THE FRANCHISOR MAY REVISE THIS PIP. THE PIP IS VOID 180 DAYS AFTER THE INSPECTION DATE UNLESS THE FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE.

The Franchise Review Committee may in its discretion revise this PIP as a condition of approving your application. You should not consider this PIP to be final until we s/gn the License or Franchise Agreement.

Signed: _____   Date: 3/30/12

Print Name: SANDIP PATEL _____

## OWNER APPLICANT

| | |
|---|---|
| Property Name: | Village Inn |
| Property Address: | 314 Bay Blvd. |
| City: | Seaside Heights |
| St: | NJ |
| Zip: | 8751 |
| Country: | United States |
| Brand | Travelodge |
| Tier | |
| Opportunity Name: | TRA-Seaside Heights-NJ-50 |
| Account Name: | TRA-Seaside Heights-NJ-50 |
| Owner/Applicant | Sandip Patel |
| Owner Phone: | 973-767-8200 |
| Development Director: | Brian Krause |
| Phone: | 973-229-4310 |
| Nearest City & State | Camden, New Jersey |

## INSPECTION INFORMATION

| | |
|---|---|
| Conversion Consultant: | Craig Bloom |
| Number of Buildings Punched: | 1 |
| Number of Rooms Inspected: | 6 |
| Rooms Inspected: | 216, 215, 213, 316, 315 and 313 |

## PROPERTY INFORMATION

| | |
|---|---|
| Age of Property: | 1978 |
| Total Number of Floors: | 3 |
| Single/Double Loaded: | Double Loaded |
| Exterior/Interior Corridor: | Exterior Corridor |
| Construction: | Concrete |
| Competition: | All other hotels on the island are independent properties. |
| Clientele: | 100% Leisure |
| Total Licensed Guestrooms: | 50 |
| | |
| | |
| Total Meeting Rooms | 0 |
| Total Restaurants | 0 |
| Total Lounges | 0 |

**BRAND STANDARD VARIANCES**

* The Brand has approved the existing lobby area for continued use while providing a registration desk, leisure seating and the continental breakfast offering.
* The Brand has approved the property to provide the Travelodge "Grab and Go" Continental Breakfast offering on a conditional basis. If guest comments/compliants reflect poor guest satisfaction within the continental breakfast category, site must expand and construct/provide a continental breakfast per current Brand Standards.
* The existing guestroom bedsets will be acceptable until condition grades a "Major" on any future Quality Assurance evaluation or bedsets exceed 10 years of age , whichever occurs first. Upon replacement, bedsets meeting current Brand Standards will be required.

The non-compliant items on the punchlist are separated by area of work (exterior, public areas, food and beverage, and guestrooms) and fall into three categories:

1) CTO (Critical To Open Brand standards)- These brand standards are key in affiliating yourself with the brand and are critical to open your facility. Each of the items listed must be completed prior to opening your facility unless otherwise noted.

2) ST (Brand Standards)- These standards are required to affiliate yourself with the brand. All items noted with an ST must be completed within the required timeframe.

3) COND (Condition)- These items reviewed did not meet brand quality standards. These items have a negative impact to the guest experience and must be corrected within the noted timeframes and if applicable comply with current brand standards. We recommend all franchisees implement and adhere to an ongoing self inspection and preventative maintenance program.

| Area of work | Subject of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|
| General | Cleanliness | CTO | The Property must be maintained in a clean and neat condition.  This requirement pertains to all areas of the property, including, but not limited to: grounds, curb appeal, building, equipment, decor, furniture, fixtures and equipment, vehicles, signs, linens and supplies.  To help ensure the property maintains housekeeping at the highest levels, property will be subject to recurring quality assurance evaluations.  Properties not meeting cleanliness standards may be required to complete housekeeping training. | Prior to open | 119.00 / 200.01 / 507.00 |
| Exterior | Signs | CTO | Provide Company approved signage per Brand graphic standard specifications.  A fully executed prepaid contract with an approved sign vendor must be provided prior to commencement.  Please contact a property openings manager at 800-343-7839 for approved sign vendor information. | Prior to open | 600.00 - 603.09 |
| Exterior | Signs | COND | Paint signage stanchion. | Prior to open | 100.03 / 600.00 |
| Exterior | Façade | COND | Clean, repair and paint building exteriors to include the building used for storage where damaged or peeling to provide a consistent appearance. | 3 Months after opening | 700.00 / 702.00 |
| Exterior | Windows / Doors | COND | Replace/repair windows where seals are broken (fogged appearance). | 3 Months after opening | 204.07 |
| Exterior | Windows / Doors | COND | Refinish window and door frames in lobby entry area and exterior staircases to eliminate pitted metal appearance. | 3 Months after opening | 204.07 |
| Exterior | Storefronts / PTAC / Louvers | COND | Replace/Provide PTAC grills where damaged, dented or missing. Ensure grills are uniform in style. | 3 Months after opening | 700.00 / 702.00 |

| Area of work | Subject of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|
| Exterior | Walkways / Steps / Patio | COND | Clean and refinish (paint) concrete and tiled walkways and stairways to provide a consistent appearance. | 3 Months after opening | 706.01 |
| Exterior | Paving / Curbing / Striping | COND | Hot-patch, reseal and stripe parking lot. Resurface badly cracked and damaged areas. | 3 Months after opening | 722.01 / 722.03 |
| Exterior | Outdoor Pool Area | ST | A swimming pool signage package should be posted indicating pool hours and any rules of usage. | Prior to season opening | 724.00 / 724.02 |
| Exterior | Outdoor Pool Area | COND | Refinish swimming pool surface. Deep clean swimming pool coping tiles to eliminate stains and/or discoloration. If stains and/or discoloration remain, complete replacement of coping tiles is required. | Prior to season opening | 724.03 |
| Exterior | Outdoor Pool Area | COND | Replace swimming pool deck turf. | Prior to season opening | 724.01 |
| Public Areas | Property Management System | CTO | Replace existing property management system as per Brand Standards. | Prior to open | 1100.00 / 1101.00 / 1102.00 |
| Public Areas | Training / Orientation | ST | Property manager is required to be Wyndham Rewards certified and property must fully comply with all Wyndham Rewards requirements. | Prior to open | 102.03 |
| Public Areas | Directional / Service Signs / Room #'s | CTO | Provide a professionally produced and displayed signage package as required per Brand Standards. Existing signage that is logo'd, or has a style or color that is associated with another brand or incompatible with current Brand Standards, or if signs are missing from required places must be replaced or installed. | Prior to open | 204.03 / 603.00 |
| Public Areas | Lobby (Finishes) | ST | Install lobby carpet. | 2 Months after opening | 704.08 / 704.09 |
| Public Areas | Lobby (FF&E / Other) | COND | Provide lobby art package. New package must be professionally displayed. | 2 Months after opening | 704.00 / 704.01 |
| Public Areas | Lobby (FF&E / Other) | COND | Provide lobby lighting package per Brand Standards. | 2 Months after opening | 704.03 |
| Public Areas | Lobby (FF&E / Other) | COND | Provide lobby seating package to include tables. | 2 Months after opening | 704.02 |
| Public Areas | Lobby (FF&E / Other) | COND | Provide lobby window dressings per Brand Standard. | 2 Months after opening | 704.10 |
| Public Areas | Lobby (FF&E / Other) | ST | Refinish registration desk, including counter per Brand Standards. | Prior to open | 704.00 / 705.00 / 705.01 |
| Public Areas | Stairwells (Finishes) | COND | Replace carpet in stairwells. | 2 Months after opening | 706.01 / 713.00 |
| Public Areas | Stairwells (Finishes) | COND | Paint stairwells to eliminate scuffs to provide a consistent appearance. | 2 Months after opening | 706.01 / 713.00 |
| Public Areas | Ice / Vending / Guest Laundry (OPS/other) | ST | Provide a vending area per Brand Standards. | Prior to open | 715.00 |
| Public Areas | Continental Breakfast | CTO | Provide a Continental Breakfast as per Brand Standards. | Prior to open | 400.00 |
| Public Areas | Breakfast Area (FF&E / Other) | COND | Provide professionally crafted cabinetry/countertops in breakfast area per Brand Standards. | 2 Months after opening | 400.00 / 704.01 |

| Area of work | Subject of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|
| Public Areas | Breakfast Area (FF&E / Other) | COND | Provide breakfast area seating package (chairs and tables) per Brand Standards. At a minimum, seating for 20% of guestrooms is required. | 2 Months after opening | 400.00 / 704.01 |
| Guestrooms | Guestrooms (Operational) | ST | There are 2 rooms that measure 234 SF. These rooms are required to be designated as one-bedded rooms and have been approved by the Brand. | Prior to open | N/A |
| Guestrooms | Guestrooms (Operational) | ST | Provide AM/FM alarm clock radios and coffee maker per Brand Standards | 2 Months after opening | 218.00 / 219.00 |
| Guestrooms | Guestrooms (Operational) | ST | Provide 50% of non-smoking rooms per Brand Standards. | Prior to open | 101.04 |
| Guestrooms | Guestrooms (Operational) | ST | Compact fluorescent energy saving light bulbs are required to be installed in the guestroom and guestroom bath areas. | 3 Months after opening | 222.02 |
| Guestrooms | Entrance Door Lock System | CTO | Install electronic lock device on entrance doors per Brand Standards. | Prior to open | 204.04 |
| Guestrooms | Secondary Locks | CTO | Replace secondary locks on entrance doors as per Brand Standards. | Prior to open | 204.04 |
| Guestrooms | Guestroom (Finishes) | COND | Repair/refinish ceiling where needed to provide a consistent appearance. | 3 Months after opening | 203.01 |
| Guestrooms | Guestroom (Finishes) | COND | Remove mirrored wallcovering and repair affected areas to provide a consistent appearance. | 1 Year after opening | 203.02 |
| Guestrooms | Guestrooms (FF&E / Other) | ST | Provide artwork package where missing. | 3 Months after opening | 209.00 |
| Guestrooms | Guestrooms (FF&E / Other) | ST | Provide a matching casegoods package to include chairs. | 3 Months after opening | 206.00-206.05 |
| Guestrooms | Guestrooms (FF&E / Other) | ST | Provide a framed wall mirror or full length mirror where missing.  Mirror must not be door mounted. New mirrors must match existing casegoods or complete casegoods package replacement is required. | 2 Months after opening | 207.00 |
| Guestrooms | Guestrooms (FF&E / Other) | ST | Provide headboards where missing. | Prior to open | 206.01 |
| Guestrooms | Lighting | ST | Provide a matching lamp package as per Brand Standards. | Prior to open | 212.00 |
| Guestrooms | Lighting | ST | Provide coordinating lamp cord covers. | 3 Months after opening | 212.00 |
| Guestrooms | Drapes | COND | Replace draperies. | Prior to open | 205.00 |
| Guestrooms | Bedspreads / Bed Toppings | COND | Replace bed toppings with one of the Brand approved bedding program options.  Bed toppings must coordinate with draperies | Prior to open | 201.09 |
| Guestrooms | Linen (Towels & Sheets) | ST | Provide a complete inventory of linen to include sheets, pillows, pillowcases, blankets, mattress pads and complete inventory of terry stock to include washcloths, bathmats and bath and hand towels per Brand Standards. | Prior to open | 201.05 / 201.06 / 308.01 |
| Guestrooms | Bath and Vanity Area (Finishes) | COND | Repair/refinish bathroom ceilings where needed to provide a consistent appearance. | 3 Months after opening | 203.01 |
| Guestrooms | Bath and Vanity Area (Finishes) | COND | Deep clean and seal bathroom tile flooring to remove grout discoloration.  If discoloration remains, regrouting will be required. | 2 Months after opening | 304.00 |
| Guestrooms | Bath and Vanity Area (FF&E) | COND | Install a GFCI outlet in vanity areas where missing. | 2 Months after opening | 306.01 / 306.02 |
| Guestrooms | Bath and Vanity Area (FF&E) | ST | Provide sink stoppers where missing. | 2 Months after opening | 308.01 / 308.04 |

| Area of work | Subject of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|
| Guestrooms | Bath and Vanity Area (FF&E) | COND | Replace plumbing fixtures/trim (sinks and bathtubs) where needed. | 2 Months after opening | 306.01 / 306.05 |
| Guestrooms | Bath Area (Tub / Shower / Toilets) | COND | Deep clean tub surface, regrout and seal bathtub wall surround tiles. Recaulk as needed. | 3 Months after opening | 306.04 |
| Guestrooms | Bath Area (Tub / Shower / Toilets) | ST | Provide the required Brand Standard shower heads in all bath areas. | 3 Months after opening | 306.06 / 306.10 / 306.11 |
| Guestrooms | Guestroom / Bath Amenities | CTO | Provide guestroom and bath amenities package per Brand Standards. | Prior to open | 307.00 |

## GUARANTY

To induce TRAVELODGE HOTELS, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, and Dispute Resolution and WAIVER OF JURY TRIAL applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

_____
Name: **Sandip Patel**
Address: **300 Kimball Street**
    **Woodbridge, NJ 07095**

40

# EXHIBIT B

## GUARANTY

To induce TRAVELODGE HOTELS, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, and Dispute Resolution and WAIVER OF JURY TRIAL applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

Name: Sandip Patel
Address: **300 Kimball Street**
　　　　　**Woodbridge, NJ 07095**

40

TRA FA CON
247079 Q3/11

# EXHIBIT C



# WYNDHAM

## HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445
www.wyndhamworldwide.com

September 4, 2014

**VIA 2 DAY DELIVERY METHOD**

Mr. Sandip Patel
Seaside Hospitality LLC
314 Bay Boulevard
Seaside Heights, NJ 08751

RE:   **NOTICE OF DEFAULT** relating to Travelodge® Unit #46431-01908-1 located in Seaside Heights, NJ (the "Facility")

Dear Mr. Patel:

I write on behalf of Travelodge Hotels, Inc. ("we", "our" or "us") regarding the Franchise Agreement, dated March 30, 2012, between Seaside Hospitality LLC, ("you" or "your") and us (the "Agreement"). We write to give you formal notice that you are in default (the "Notice") under the Agreement. Specifically, during a recent Quality Assurance inspection, the following safety issues were discovered: i) broken or missing secondary locks; ii) build-up on the windows and stairwells; iii) poor lighting; and iv) buckled and wrinkled carpet by the pool. Additionally, we have received information alleging that there are fire detectors hanging from the ceiling and non-functioning phones in guestrooms.

We remind you that Section 3.2 of the Agreement reads as follows: "You will operate, and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards." Additionally, Section 3.11 of the Agreement states: "[y]ou will use reasonable efforts to protect, maintain, and promote the name "Travelodge" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or the System." Your failure to comply with the System Standards is a breach of the Agreement and seriously impacts the goodwill of the Travelodge System.

Under the terms of the Agreement, you have thirty (30) days to cure this default; however we demand that you take all necessary steps to remedy this serious situation immediately. If you do not cure your default within the timeframe permitted, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Travelodge System.



## HOTEL GROUP

      

        

Mr. Sandip Patel
September 4, 2014
Page Two

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system. By copy of this letter, we are also informing your guarantor of your default.

We urge you to address this serious situation without delay. If you have any questions regarding this default, please contact me directly at (973) 753-7546.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

cc:     Sandip Patel (Guarantor) – 300 Kimball Street, Woodbridge, NJ 07095
        Caryl Porter
        Michael Piccola
        Joe Maida

UPS CampusShip: Shipment Receipt                                      Page 1 of 1

 **Shipment Receipt**

**Transaction Date: 04 Sep 2014**              **Tracking Number:**      1Z22445X0295878077

**1 | Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Seaside Hospitality LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Mr. Sandip Patel | Kristine Violette | Kristine Violette |
| 314 Bay Boulevard | 22 Sylvan Way | 22 Sylvan Way |
| SEASIDE HEIGHTS NJ 087512410 | Parsippany NJ 07054 | Parsippany NJ 07054 |
|  | Telephone:9737537204 | Telephone:9737537204 |

**2 | Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter (Letter billable) | UPS Letter |  | Reference # 1 - 006-1696<br>Reference # 2 -<br>Reference # 3 - |

**3 | UPS Shipping Service and Shipping Options**

| Service: | UPS 2nd Day Air |
|---|---|
| Shipping Fees Subtotal: | 17.16 USD |
| Transportation | 13.35 USD |
| Fuel Surcharge | 1.56 USD |
| Delivery Area Surcharge |  |
| Package 1 | 2.25 USD |

**4 | Payment Information**

Bill Shipping Charges to:                        Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| Total Charged: | 17.16 USD |
|---|---|
| Negotiated Total: | 9.48 USD |

Note: Your invoice may vary from the displayed reference rates.
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

UPS CampusShip: Shipment Receipt                                    Page 1 of 1

 **Shipment Receipt**

**Transaction Date: 04 Sep 2014**              **Tracking Number:**      1Z22445X0296154687

**1** **Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Seaside Hospitality LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Sandip Patel | Kristine Violette | Kristine Violette |
| 300 Kimball Street | 22 Sylvan Way | 22 Sylvan Way |
| WOODBRIDGE NJ 070952513 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| | Telephone:9737537204 | Telephone:9737537204 |

**2** **Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1. Letter | UPS Letter | | Reference # 1 - 006-1696 |
| (Letter billable) | | | Reference # 2 - |
| | | | Reference # 3 - |

**3** **UPS Shipping Service and Shipping Options**

| | |
|---|---|
| **Service:** | UPS 2nd Day Air |
| **Shipping Fees Subtotal:** | 14.69 USD |
| Transportation | 13.35 USD |
| Fuel Surcharge | 1.34 USD |

**4** **Payment Information**

Bill Shipping Charges to:                    Shipper's Account 22445X

**A discount has been applied to the Daily rates for this shipment**

| | |
|---|---|
| Total Charged: | 14.69 USD |
| Negotiated Total: | 6.99 USD |

Note: Your Invoice may vary from the displayed reference rates.
* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

https://www.campusship.ups.com/cship/create?ActionOriginPair=default___PrintWindowP...   9/4/2014

# EXHIBIT D

USAO #2014R00102

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA   :   Criminal No. 14-

                   v.       :

                           :   18 U.S.C. § 371;
SANDIPKUMAR PATEL     :   26 U.S.C. § 7206(1)

## I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, and any challenges to venue, the Department of Justice, Criminal Division, and the United States Attorney for the District of New Jersey charge:

### COUNT ONE
### Conspiracy to Defraud the United States

1.  At all times relevant to Count One of this Information:

a.  Temporary employment-based work visas ("H-1B Visas") were issued by the Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS").

b.  An H-1B Visa could be issued to a qualified alien job applicant who sought temporary work in the United States in one of several "Specialty Occupations." Network engineer was a Specialty Occupation.

c.  In order for an alien to secure an H-1B Visa, a prospective employer first was required to file with the Department of Labor ("DOL") an ETA-9035 Labor Condition Attestation attesting to, among other things, its need for the

1

qualified Specialty Occupation worker and its ability to pay such worker.

d.   Once DOL found that the prospective employer demonstrated its need for a qualified Specialty Occupation worker and approved its ETA-9035 Labor Condition Attestation, the employer would file an I-129 Petition for a Nonimmigrant Alien Worker ("I-129 Petition") with USCIS and the Department of State ("DOS"), requesting that USCIS and DOS issue an H-1B Visa for the qualified Specialty Occupation worker.  In the I-129 Petition, the prospective employer:  identified the qualified Specialty Occupation worker to be employed; provided information about the person's proposed employment, including job title, work location, and annual compensation; and provided information about the petitioning company, including type of business, number of employees, and company earnings.  A job offer letter from the prospective employer addressed to the qualified Specialty Occupation worker was attached to the I-129 Petition.

e.   This same process – of first filing an ETA-9035 Labor Condition Attestation with DOL and, on its approval, later filing an I-129 Petition with USCIS and DOS – also could be used to extend an existing H-1B Visa with the same employer or to transfer a qualified Specialty Occupation worker's existing H-1B Visa to a different petitioning employer.  An H-1B Visa

generally was valid for three years and renewable for three additional years.

     f.  The number of I-129 Petitions filed with USCIS each year far exceeded the limited number of H-1B Visas available. As a result, H-1B Visas were valuable to aliens seeking employment in the United States and, despite being a non-immigrant visa, in certain instances, represented the first step in obtaining U.S. citizenship.

### The Defendant and his Entities

2.  At all times relevant to this Information, Defendant SANDIPKUMAR PATEL was a resident of Edison, New Jersey and was a principal of several corporations including Software Programming and Consulting ("SPC"), purportedly an information-technology and engineering consulting company, based in Edison, New Jersey. In his capacity as the principal of SPC, defendant SANDIPKUMAR PATEL sought H-1B Visas for aliens by claiming that these aliens possessed specialized information technology skills and by claiming that they would work for SPC in the United States.

3.  In addition to SPC, defendant SANDIPKUMAR PATEL was the principal of other entities which he used to engage in H-1B fraud, including:

     a.  Mercury Staffing, Inc. ("MSI"), a Delaware corporation with offices in New York, New York and Edison, New Jersey, which was an employment staffing business; and

3

b. Medical Staffing International ("Medical Staffing"), a
Delaware corporation with offices in Woodbridge, New
Jersey and Edison, New Jersey, which was an employment
staffing business.

## The Conspiracy to Defraud the United States

4. From in or about May 2001 through in or about May 2009, in
Middlesex County, in the District of New Jersey, and elsewhere,
defendant

SANDIPKUMAR PATEL

did knowingly and intentionally conspire and agree with others
to defraud the United States and its agencies thereof by
impeding, impairing, obstructing and defeating the lawful
governmental functions of DOS and USCIS to properly ascertain,
assess, evaluate and adjudicate legitimate I-129 Petitions.

## The Object of the Conspiracy

5. It was the object of the conspiracy to improperly secure
employment-based H-1B Visas for individuals seeking to live and
work in the United States by submitting materially false and
fraudulent I-129 Petitions in exchange for payments of tens of
thousands of dollars.

## The Manner and Means of the Conspiracy to Defraud

6. It was part of the scheme and artifice to defraud that
members of the conspiracy prepared and submitted, and caused to
be prepared and submitted, to DOS and USCIS, I-129 Petitions

4

containing false statements and material misrepresentations in order to secure H-1B Visas authorizing at least 12 individuals to work in a Specialty Occupation for a designated employer.

7.   It was further part of the scheme and artifice to defraud that the defendant SANDIPKUMAR PATEL and his co-conspirators engaged in a practice which made it appear that the alien H-1B Visa recipients actually performed work and were paid for that work by the Specialty Occupation employer, as required under the terms of their H-1B Visas.  This practice entailed placing the alien H-1B Visa recipients on Specialty Occupation employer payrolls and issuing them fabricated paychecks, despite the fact that no work was performed for the Specialty Occupation employer.

8.   It was further part of the scheme and artifice to defraud that the alien H-1B Visa recipients returned the proceeds of the fabricated paychecks to defendant SANDIPKUMAR PATEL and his co-conspirators by several means, including in the form of cash or personal check.  In addition to the payroll amount, defendant SANDIPKUMAR PATEL charged the alien H-1B Visa recipients a certain amount over and above the amount of the payroll check to cover purported employment and income taxes.

9.   It was further part of the scheme and artifice to defraud that defendant SANDIPKUMAR PATEL and his co-conspirators submitted fabricated Specialty Occupation employer paystubs as

evidence of Specialty Occupation employment to DOL and USCIS in support of applications for H-1B Visa renewal.  In addition to being fabricated, the paystubs submitted to DOL and USCIS were often inflated from the payroll amounts to reflect the representations made in previous visa applications.

10.  It was further part of the scheme and artifice to defraud that defendant SANDIPKUMAR PATEL caused those who received fraudulently obtained H-1B Visas to pay him thousands of dollars to petition government agencies on their behalf and to utilize the fake payroll practice in order for the alien recipients to obtain H1-B Visas to which they were not otherwise entitled.

<u>Overt Acts</u>

11.  In furtherance of the conspiracy and to effect the object thereof, defendant SANDIPKUMAR PATEL along with his co-conspirators committed and caused to be committed the following overt acts, among others, within the District of New Jersey, and elsewhere:

    a.  Prior to May 2001, defendant SANDIPKUMAR PATEL filed and caused to be filed an I-129 Petition on behalf of an individual with the initials "R.P.", a prospective alien H-1B Visa recipient, containing false statements and material misrepresentations in order to obtain an H-1B Visa for R.P. Among the misrepresentations was that R.P. would work for SPC as a network engineer.  In or about May 2001, R.P.'s H-1B Visa was

granted based on defendant SANDIPKUMAR PATEL's petition on his behalf and R.P. traveled to the United States in September 2001. Defendant SANDIPKUMAR PATEL charged R.P. $15,000 for his efforts in acquiring this H-1B Visa.

b.  In or about September 2001, defendant SANDIPKUMAR PATEL told R.P. that he would receive a salary of about $3,000 a month all of which R.P. would have to return to defendant SANDIPKUMAR PATEL plus approximately $1,060 per month to cover defendant SANDIPKUMAR PATEL's employment and income taxes.  R.P. would typically pay defendant SANDIPKUMAR PATEL using checks from a personal checking account.

c.  In or about August 2003, defendant SANDIPKUMAR PATEL and his co-conspirators filed and caused to be filed an I-129 Petition on behalf of R.P., containing false statements and material misrepresentations in order to renew R.P.'s H-1B Visa. Defendant SANDIPKUMAR PATEL charged another $15,000 for filing the renewal petition.

d.  In or about June 2006, defendant SANDIPKUMAR PATEL and his co-conspirators filed and caused to be filed an I-129 Petition on behalf of R.P., containing false statements and material misrepresentations in order to continue R.P.'s H-1B Visa status.  Defendant SANDIPKUMAR PATEL charged $4,500 for filing this petition.

e.   In or about November 2008, defendant SANDIPKUMAR PATEL and his co-conspirators filed and caused to be filed an I-129 Petition on behalf of R.P., containing false statements and material misrepresentations in order to renew R.P.'s H-1B Visa. Defendant SANDIPKUMAR PATEL charged $3,500 for filing this petition.

f.   On or about April 27, 2009, R.P. deposited two purported payroll checks dated March 13, 2009 and March 31, 2009, each in the amount of $1,521.81.  On or about May 19, 2009, two checks in the amounts of $2,020.00 and $2,000.00 respectively, drawn from R.P.'s checking account and made out to cash, were deposited into defendant SANDIPKUMAR PATEL's co-conspirators' checking account.

In violation of Title 18, United States Code, Section 371.

## COUNT TWO
### Subscribing to a False Tax Return

1.   Paragraphs 1 through 11 of Count One of this Information are hereby realleged and incorporated as if set forth in full herein.

2.   In addition to engaging in the H-1B fraud and the payroll scheme, defendant SANDIPKUMAR PATEL deducted the fake payroll amounts on the tax returns of his entities, amounts which had been returned to him by the alien H-1B Visa recipients, as described in Count One.

## False Tax Filings

3.   Defendant SANDIPKUMAR PATEL improperly deducted payroll payments on the tax returns on his various entities, including SPC, MSI and Medical Staffing, resulting in the under-reporting of the income to him from those entities on his individual income tax returns filed for the calendar years 2006, 2007, 2008 and 2009.  In this fashion, defendant SANDIPKUMAR PATEL over-stated the payroll expenses on the tax returns for his various entities by more than $1,430,850.00 for the calendar years 2006, 2007, 2008 and 2009, upon which an additional tax of approximately $423,542.00 was due and owing to the United States on his individual tax returns.  Specifically:

    a.   The individual income tax return defendant SANDIPKUMAR PATEL filed for the calendar year 2006 ("the 2006 Tax Return") did not include approximately $316,925.00 in additional income due to improper payroll deductions taken by defendant SANDIPKUMAR PATEL on tax returns of his various entities in 2006.  Upon this income, an additional tax of approximately $110,621.00 was due and owing to the United States.

    b.   The individual income tax return defendant SANDIPKUMAR PATEL filed for the calendar year 2007 ("the 2007 Tax Return") did not include approximately $450,225.00 in additional income due to improper payroll deductions taken by defendant SANDIPKUMAR PATEL on tax returns of his various entities in

9

2007.  Upon this income, an additional tax of approximately $153,225.00 was due and owing to the United States.

c.  The individual income tax return defendant SANDIPKUMAR PATEL filed for the calendar year 2008 did not include approximately $415,600.00 in additional income due to improper payroll deductions taken by defendant SANDIPKUMAR PATEL on tax returns of his various entities in 2008.  Upon this income, an additional tax of approximately $94,738.00 was due and owing to the United States.

d.  The individual income tax return defendant SANDIPKUMAR PATEL filed for the calendar year 2009 did not include approximately $248,100.00 in additional income due to improper payroll deductions taken by defendant SANDIPKUMAR PATEL on tax returns of his various entities in 2009.  Upon this income, an additional tax of approximately $64,958.00 was due and owing to the United States.

4.  On or about October 13, 2008, defendant SANDIPKUMAR PATEL signed, filed, and caused to be filed with the IRS the 2007 Tax Return.

5.  The 2007 Tax Return was signed by defendant SANDIPKUMAR PATEL and contained a written declaration that it was signed under penalties of perjury.

6.  As set forth above in paragraph 3.a, of Count Two of this Information, the 2007 Tax Return was not true and correct as to

10

every material matter, in that the return failed to report a significant portion of the income that defendant SANDIPKUMAR PATEL received by virtue of the improper payroll deductions during the calendar year 2007, upon which a substantial additional tax was due and owing.

7.    On or about October 13, 2008, in Middlesex County, in the District of New Jersey, and elsewhere, defendant

SANDIPKUMAR PATEL

did knowingly and willfully make and subscribe a 2007 U.S. Individual Income Tax Return, Form 1040, as described in paragraph 3.b of Count Two of this Information, which he did not believe to be true and correct as to every material matter, as described in paragraph 3.b of Count Two of this Information.

In violation of Title 26, United States Code, Section 7206(1).

_Paul J Fishman_

PAUL J. FISHMAN
United States Attorney

11

CASE NUMBER:  14-

United States District Court
District of New Jersey

UNITED STATES OF AMERICA

v.

SANDIPKUMAR PATEL

INFORMATION FOR
18 U.S.C. § 371
26 U.S.C. § 7206

PAUL J. FISHMAN
*United States Attorney*
*Newark, New Jersey*

DANIELLE CORCIONE
*Assistant United States Attorney*
*(973)645-2700*

# EXHIBIT E



**FILE COPY**

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

| | |
|---|---|
| *970 Broad Street, Suite 700*<br>*Newark, NJ 07102* | *(973) 645-2700* |

HSO/PL AGR
USAO 2014 R00102

April 21, 2014

Eric Breslin, Esq.
Duane Morris LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102-5429

Re:  <u>Plea Agreement with Sandipkumar Patel</u>

Dear Mr. Breslin:

This letter sets forth the plea agreement between your client, Sandipkumar Patel, and the United States Department of Justice  Criminal Division, and the United States Attorney for the District of New Jersey (together referred to as "the Government").

<u>Charge</u>

Conditioned on the understandings specified below, the Government will accept a guilty plea from Sandipkumar Patel to a two-count Information which charges defendant Sandipkumar Patel with one count of conspiring to defraud the United States in violation of Title 18, United States Code, Section 371 (Count One) and one count of subscribing to a false federal income tax return (for the year 2007), in violation of Title 26, United States Code, Section 7206(1) (Count Two).  If Sandipkumar Patel enters a guilty plea and is sentenced on these charges, and otherwise fully complies with all of the terms of this agreement, the Government will not initiate any further criminal charges against Sandipkumar Patel for (1) his visa fraud and alien harboring activity from in or about May 2001 through in or about May 2009, as is more fully set forth in Count One of the Information and (2) evading any federal income tax and making false statements on his federal income tax returns from 2006 through 2009.  However, in the event that a guilty plea in this matter is not entered for any reason or the judgment of

conviction entered as a result of this guilty plea does not remain in full force and effect, Sandipkumar Patel agrees that any dismissed charges and any other charges that are not time-barred by the applicable statute of limitations on the date this agreement is signed by Sandipkumar Patel may be commenced against him, notwithstanding the expiration of the limitations period after Sandipkumar Patel signs the agreement.

This plea agreement is contingent upon approval by the Department of Justice, Tax Division.

<u>Sentencing</u>

The violation of Title 18, United States Code, Section 371 (conspiracy to defraud the United States), as set forth in Count One of the Information, to which Sandipkumar Patel agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (1) $250,000; (2) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (3) twice the gross amount of any pecuniary loss sustained by any victims of the offense.

The violation of Title 26, United States Code, Section 7206(1) (subscribing to a false tax return), as set forth in Count Two of the Information, to which Sandipkumar Patel agrees to plead guilty carries a statutory maximum prison sentence of three years and a statutory maximum fine of ~~$100,000.~~ **$250,000.** *EM Sp.*

The sentence on each count may run consecutively. Fines imposed by the sentencing judge may be subject to the payment of interest.

The sentence to be imposed upon Sandipkumar Patel is within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act, 18 U.S.C. §§ 3551-3742, and the sentencing judge's consideration of the United States Sentencing Guidelines. The United States Sentencing Guidelines are advisory, not mandatory. The sentencing judge may impose any reasonable sentence up to and including the statutory maximum term of imprisonment and the maximum statutory fine. The Government cannot and does not make any representation or promise as to what guideline range may be found by the sentencing judge, or as to what sentence Sandipkumar Patel ultimately will receive.

Further, in addition to imposing any other penalty on Sandipkumar Patel, the sentencing judge:  (1) will order Sandipkumar Patel to pay an assessment of $100 per count pursuant to 18 U.S.C. § 3013, which assessment must be paid by the date of sentencing; (2) may order Mr. Patel to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664; (3) may order Mr. Patel, pursuant to 18 U.S.C. §§ 3555, give notice to any victims of his offenses; (4) may order Mr. Patel to pay the costs of prosecution; and (5) may require Mr. Patel to serve a term of supervised release of not more than three years as to Count One and not more than two years as to Count Two, which will be at the expiration of any term of imprisonment imposed. Should Mr. Patel be placed on a term of supervised release and subsequently violate any of the conditions of supervised release before the expiration of its term, Mr. Patel may be sentenced to not more than two years' imprisonment as to Count One and not more than one year imprisonment as to Count Two in addition to any prison term previously imposed, regardless of the statutory maximum term of imprisonment set forth above and without credit for time previously served on post-release supervision, and may be sentenced to an additional term of supervised release.

Restitution

Sandipkumar Patel also agrees to make full restitution to the Internal Revenue Service for all losses resulting from the offenses of conviction or from the scheme, conspiracy, or pattern of criminal activity underlying that offense.

Rights of the Government Regarding Sentencing

Except as otherwise provided in this agreement, the Government reserves its right to take any position with respect to the appropriate sentence to be imposed on Sandipkumar Patel by the sentencing judge, to correct any misstatements relating to the sentencing proceedings, and to provide the sentencing judge and the United States Probation Office all law and information relevant to sentencing, favorable or otherwise.  In addition, the Government may inform the sentencing judge and the United States Probation Office of:  (1) this agreement; and (2) the full nature and extent of Sandipkumar Patel's activities and relevant conduct with respect to this case.

Stipulations

        The Government and Sandipkumar Patel agree to
stipulate at sentencing to the statements set forth in the
attached Schedule A, which hereby is made a part of this plea
agreement.  This agreement to stipulate, however, cannot and
does not bind the sentencing judge, who may make independent
factual findings and may reject any or all of the stipulations
entered into by the parties.  To the extent that the parties do
not stipulate to a particular fact or legal conclusion, each
reserves the right to argue the existence of and the effect of
any such fact or conclusion upon the sentence.  Moreover, this
agreement to stipulate on the part of the Government is based on
the information and evidence that the Government possesses as of
the date of this agreement.  Thus, if the Government obtains or
receives additional evidence or information prior to sentencing
that it determines to be credible and to be materially in
conflict with any stipulation in the attached Schedule A, the
Government shall not be bound by any such stipulation.  A
determination that any stipulation is not binding shall not
release either the Government or Sandipkumar Patel from any
other portion of this agreement, including any other
stipulation.  If the sentencing court rejects a stipulation,
both parties reserve the right to argue on appeal or at post-
sentencing proceedings that the sentencing court was within its
discretion and authority to do so.  These stipulations do not
restrict the Government's right to respond to questions from the
Court and to correct misinformation that has been provided to
the Court.

Waiver of Appeal and Post-Sentencing Rights

        As set forth in Schedule A, the Government and
Sandipkumar Patel waive certain rights to file an appeal,
collateral attack, writ, or motion after sentencing, including
but not limited to an appeal under 18 U.S.C. § 3742 or a motion
under 28 U.S.C. § 2255.

Rights of the Government Regarding Post-Sentencing Proceedings

        The Government specifically reserves the right to
file, oppose, or take any position in any appeal, collateral

- 4 -

attack, or proceeding involving post-sentencing motions or writs.

Immigration Consequences

        The defendant understands that, if he is not a citizen of the United States, his guilty plea to the charged offenses will likely result in his being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible, or ending his naturalization.  The defendant understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities.  The defendant wants and agrees to plead guilty to the charged offense regardless of any immigration consequences of this plea, even if this plea will cause his removal from the United States.  The defendant understands that he is bound by his guilty plea regardless of any immigration consequences of the plea. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on any immigration consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

Other Provisions

        This agreement is limited to the United States Department of Justice, Criminal Division, and the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities.  However, the Government will bring this agreement to the attention of other prosecuting offices, if requested to do so.

        This agreement was reached without regard to any civil or administrative matters that may be pending or commenced in the future against Sandipkumar Patel.  This agreement does not prohibit the United States, any agency thereof (including the Internal Revenue Service and Immigration and Customs Enforcement), or any third party from initiating or prosecuting any civil or administrative proceeding against Sandipkumar Patel.

- 5 -

Prior to the date of sentencing, Sandipkumar Patel shall: (1) file accurate amended personal returns or enter into a Form 870 Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment signed by Patel in lieu of filing returns or amended returns, for calendar years 2006, 2007, 2008, and 2009; (2) provide all appropriate documentation to the Internal Revenue Service in support of such returns or Form 870 Waiver, upon request; (3) pay to the Internal Revenue Service all taxes and any penalties owed on those returns or Form 870 Waiver, or if unable to do so, make satisfactory repayment arrangements with the Internal Revenue Service; and (4) fully cooperate with the Internal Revenue Service and comply with the tax laws of the United States. Further, Sandipkumar Patel agrees to allow the contents of his IRS criminal file to be given to civil attorneys and support staff of the Internal Revenue Service to enable them to investigate any and all civil penalties that may be due and owing by Sandipkumar Patel. With respect to disclosure of the criminal file to the Internal Revenue Service, Sandipkumar Patel waives any rights under Title 26, United States Code, Section 7213 and Fed. R. Crim. P. 6(e), and any other right of privacy with respect to Sandipkumar Patel's tax returns and return information.

<u>No Other Promises</u>

      This agreement constitutes the plea agreement between Sandipkumar Patel and the Government and supersedes any previous agreements between them.  No additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties.


Very truly yours,

DAVID A. O'NEIL
Acting Assistant Attorney General
U.S. Department of Justice
Criminal Division


Hope S. Olds
William H. Kenety V
Senior Trial Attorneys
U.S. Department of Justice
Criminal Division
Human Rights and Special Prosecutions Section


Danielle Corcione
Assistant U.S. Attorney
District of New Jersey


APPROVED:


Jennifer Davenport, Chief
General Crimes Unit
U.S. Attorney's Office
District of New Jersey


- 7 -

I have received this letter from my attorney, Eric Breslin, Esq. and I have read it. My attorney and I have discussed it and all of its provisions, including those addressing the charge, sentencing, stipulations, waiver, restitution, forfeiture, and immigration consequences. I understand this letter fully. I hereby accept its terms and conditions and acknowledge that it constitutes the plea agreement between the parties. I understand that no additional promises, agreements, or conditions have been made or will be made unless set forth in writing and signed by the parties. I want to plead guilty pursuant to this plea agreement.

AGREED AND ACCEPTED:

_____          Date: 05/23/14
Sandipkumar Patel


I have discussed with my client this plea agreement and all of its provisions, including those addressing the charge, sentencing, stipulations, waiver, restitution, forfeiture, and immigration consequences. My client understands this plea agreement fully and wants to plead guilty pursuant to it.

_____          Date: 5/05/14
Eric Breslin, Esq.

- 8 -

Plea Agreement With Sandipkumar Patel

Schedule A

1. The Government and Sandipkumar Patel recognize that the United States Sentencing Guidelines are not binding upon the Court. The Government and Sandipkumar Patel nevertheless agree to the stipulations set forth herein, and agree that the Court should sentence Sandipkumar Patel within the Guidelines range that results from the total Guidelines offense level set forth below. The Government and Sandipkumar Patel further agree that neither party will argue for the imposition of a sentence outside the Guidelines range that results from the agreed total Guidelines offense level.

2. The version of the United States Sentencing Guidelines effective November 1, 2013 applies in this case.

COUNT ONE (Conspiracy)

3. The applicable guideline for this offense is U.S.S.G. § 2C1.1. This offense (Conspiracy to Defraud by interference with governmental functions) carries a Base Offense Level of 12.

COUNT TWO (Tax Fraud)

4. The applicable guideline is U.S.S.G. § 2T1.1, and by reference, the Tax Tables at § 2T4.1. § 2T4.1(E) carries a Base Offense Level of 20 because the tax loss resulting from Defendant Patel's conduct was more than $400,000 but less than $1,000,000.

GROUPING ANALYSIS

5. The parties agree that Counts One and Two of the Information do not constitute Closely Related Counts within the meaning of U.S.S.G. § 3D1.1 and 3D1.2.

6. Therefore, those counts are not grouped together and, pursuant to § 3D1.4, the combined offense level is determined as follows:

a. The offense level applicable to Group One is the offense level for the most serious offense; therefore, the resulting offense level for Group One is 20. See U.S.S.G. § 3D1.3.

- 9 -

b.  The highest offense level is the offense level associated with Group One (offense level of 20), thereby constituting one Unit. See U.S.S.G. § 3D1.4(a).  In comparison, Group Two carries an offense level of 12, which is 5 to 8 levels less serious than the resulting offense level from Group One, resulting in an increase of one-half. See U.S.S.G. § 3D1.4(b). As such, one additional level is added to the Group One offense level. See U.S.S.G. 3D1.4(a)-(c).  This results in a Base Offense Level of 21.

c.  Therefore, the resulting adjusted offense level is 21.

7.  As of the date of this letter, Defendant Patel has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the offenses charged. Therefore, a downward adjustment of 2 levels for acceptance of responsibility is appropriate if Mr. Patel's acceptance of responsibility continues through the date of sentencing. See U.S.S.G. § 3E1.1(a).

8.  As of the date of this letter, Mr. Patel has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.  If Mr. Patel enters a plea pursuant to this agreement and qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and if in addition Mr. Patel's offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater, Mr. Patel will be entitled to a further 1-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(b).

9.  In accordance with the above, the parties agree that the total Guidelines offense level applicable to Mr. Patel is 18 (the "agreed total Guidelines offense level.")

10.  The parties agree not to seek or argue for any upward or downward departure, adjustment or variance not set forth herein.  The parties further agree that a sentence within the Guidelines range that results from the agreed total Guidelines offense level of 18 is reasonable.

<u>Waiver of Appeal and Post-Sentencing Rights</u>

      11. Mr. Patel knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from a total Guidelines offense level of 18. The Government will not file any appeal, motion or writ which challenges the sentence imposed by the sentencing court if that sentence falls within or above the Guidelines range that results from a total Guidelines offense level of 18. The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category. The provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, if the sentencing court accepts a stipulation, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming that the sentencing court erred in doing so.

      12. Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ or motion not barred by the preceding paragraph.

# EXHIBIT F

# The sex offender in room 13: Behind the d
# Seaside Heights' welfare motels

(o nn/share)



     

The drained pool at the Knights Inn. The Ocean County Board of Social Services houses people in need of emergency assistance in motels along the Shore that are usually hurting for business during the winter. Tuesday October 21, 2014. Seaside Heights, NJ, USA (Aristide Economopoulos | NJ Advance Media for NJ.com)

**1 / 19**

Print (http://blog.nl.com/ocean_impact/print.html?
entry=/2014/12/the_dark_side_of_seaside_heights_emerges_from_the_shadows_as_winter_takes_hold.html)
(http://connect.nl.com/user/Lisarose07102/index.html)By Lisa Rose | NJ Advance Media for NJ.com
(http://connect.nl.com/user/Lisarose07102/posts.html)
Email the author
on December 29, 2014 at 7:13 AM, updated December 29, 2014 at 2:56 PM

During the winter in Seaside Heights, the gentle ocean breeze gives way to lashing wind and the December sun shines mockingly bright, with a false promise of warmth.

The boardwalk is a sprawl of shadows, kitschy T-shirt shops are fortressed off behind gunmetal gray gates and the waves roll for no one. When the beach blanket carnival leaves town and summer revelry fades into memory, the darker side of the iconic resort community comes into focus.

Beyond the boardwalk is a morass of aging motels housing a hidden population of troubled tenants year-round, including the mentally ill, recovering drug addicts, domestic violence victims and sex offenders.

Most motels date to the post-WWII boom years, when Seaside was known as "The Town that Fun Built," a working class paradise. But decades of declining tourism and ongoing Hurricane Sandy woes have created a new business model.

Rooms where vacationers once slept are being rented to the Ocean County Board of Social Services for emergency shelter.

Nearly three quarters of the borough's 40 motels are in this survival mode, staying afloat by housing the poor in "welfare rooms," marked with Department of Community Affairs stickers.

Even as some motels shelter sex offenders or people struggling with drug issues, they continue inviting families and prom kids to spend the night. Many spots have glossy websites, enticing travelers with images of sparkling pools and the siren song of free continental breakfast. The motels look whimsical and retro online but in real life more than half failed recent inspections.

When summer is in full swing and room rates skyrocket, the homeless remain, but out of sight. The visitors who breeze into town for holiday weekends probably are not aware of who's next door.

There are 27 motels in the tiny borough that shelter the homeless for months, sometimes years. Owners collect between $1,795 and $2,625 in public money per month for each room. The nightly rate doesn't fluctuate by season. Year-round, it's $50-$85 a night. Tourists, meanwhile, pay up to $300 for a room between Memorial Day and Labor Day.

A review by NJ Advance Media of inspection reports, motel contracts, police call logs and dozens of interviews paint a picture of the poverty and blight inside the rooms:

- Of the 27 Seaside motels that shelter the homeless, only four passed recent state inspections. The rest were cited for health and safety hazards, ranging from broken smoke detectors and missing carbon monoxide alarms to electrical problems and hallways strewn with debris.

the New Jersey State Police Megan's Law registry. They dwell in welfare rooms through the quiet of winter and the bustle of summer. Management is not obligated to notify guests of their presence, according to a State Police spokeswoman, Trooper Alina Spies.

- Two high-risk sex offenders are housed at the Travelodge and the Palm Villa Suites, which sits less than 1,500 feet from the Hugh J. Boyd Jr. Elementary School.
- The homeless live and work at some motels, getting paid in cash below minimum wage, according to tenants. A convicted sex offender said he was the night watchman at the Travelodge while sheltered there for a year. Others clean rooms for cash.

"There used to be nice places here," said Sal Rispoli, 70, who operates the Heights Central rooming house. The Brooklyn native said he vacationed in Seaside as a teenager. "I brought my kids up here. Now, I look at the motel across the street and he rents to drug dealers and prostitutes."

Borough administrator John Camera said it's dubious for many owners to market the motels as daydream retreats in a world famous destination while getting paid to house emergency assistance recipients, particularly those coming out of the criminal justice system.

Borough officials have feuded for nearly three decades with motel owners who rent welfare rooms. Camera said the practice hurts tourism as the town tries to rebrand itself and attract more families.

"The motel owners have found that it makes sense to keep the steady income from social services right through the summer season, but vacationers who come for seasonal motel rentals aren't expecting and often aren't pleased with the idea of year-round people living in the motel during their summer stay," said Camera, who is retiring at the end of the month.

### Dispelling "Sleaside"

Over the past five years, Seaside has loomed large in the zeitgeist, first as a raucous party town on "Jersey Shore" and then as a symbol of Hurricane Sandy, with the sunken Jet Star rollercoaster.

Going into 2015, there's a rallying cry for redevelopment. The owners of both amusement piers have promised to bring in a new lineup of neon behemoths and luxury townhomes are under construction along Ocean Terrace.

The sex offender in room 13: Behind the doors of Seaside Heights' welfare motels | NJ.com          Page 9 of 19

Town leaders are hoping to dispel the "Sleaside" Heights stereotype. Unfortunately, Camera said, most of the motel owners aren't joining in the effort. As the borough undergoes its transition, some owners said they are increasingly reliant on money from social services.

The income is a lifeline for George Lauterbach, owner of the Mark III and the Aquarius Arms motels in Seaside. He said he'd be out of business if he relied on summer traffic. The downside is negative feedback from travelers about the tenants who live at the motel year-round, he said.

"I have problems with relief people asking customers for cigarettes, asking for money," Lauterbach said. "This is the last stop on the bus stop and people get off here because they don't have money and they're stuck here in motels. I moved to Seaside from Brooklyn for a better life. It's not a better life."

Placing a large concentration of emergency assistance recipients on a barrier island, disconnected from the resources that could help them become self-sufficient, creates a vicious cycle of poverty, crime and substance abuse, Camera said.

Although crime has declined in the borough over the past decade, according to the State Police Uniform Crime Report, Seaside's crime rate per capita is still 11 times higher than the Ocean County average.

"One of the basic premises of social work is when somebody is in need, the preference is to keep that person near their family, near places they're familiar with, near places where there's work, all the things that are not true of Seaside," Camera said. "But when push comes to shove, a social worker is going to make the placement in Seaside because it's better than having them go homeless."

It's not ideal to group the poor in a single borough, said Board of Social Services spokeswoman, Meredith Sheehan, but Seaside has a plurality of motel owners who've voluntarily agreed to participate in the emergency initiative called Special Response.

"We can only work with owners who identify they want to work with us," Sheehan said. "We can't just come in and say we're going to use your motel."

When the town council adopted an ordinance in 2006 to limit the number of welfare rooms in each establishment, a group of motel owners sued the borough for discrimination. Today, the cap is 20 percent of total occupancy but the rule has been difficult to enforce because some owners reliable occupancy numbers, said Christopher Vaz, the borough's new administrator.

(Page 13 of 21)

Melissa Grayson said she applied for Special Response housing in July and was placed at the Knight's Inn in Seaside. The manager gave her a list of rules: no pool, no visitors and no talking to other guests.

o-m/share)

"You're supposed to sit in your room and do nothing," said Grayson, 32, a registered sex offender and single mother who is sheltered at the motel with her son, 2. She was convicted when 16 of molesting two children while babysitting, according to the Megan's Law registry.

She said she suffers from a seizure disorder and has no income beyond social security disability checks. Her family is 45 minutes away in Tuckerton.

"The roof leaks, the windows leak, the door leans sideways so cold air blows through and there's bugs," Grayson said. "The summer is the worst because they don't want you talking to the paying customers. My son would see the little ones going to play at the pool and he'd want to go but he can't. It's like living in a sardine can. It's like being in prison but worse because in prison you can have visitors and phone calls and, ultimately, my kid is in jail too."

Calls to the owner of the Knights Inn, Sandipkumar Patel were not returned. Patel, known as "Mr. P" in Seaside, runs five motels in the borough, including the Travelodge, records show. He pleaded guilty in September to federal charges of visa fraud and filing a false tax return. He continues to operate the motels while he awaits sentencing Jan. 6.

Patel allegedly orchestrated a visa fraud scheme, submitting false work papers for Indian nationals who came to America illegally. The scam involved technology and medical staffing companies, not the motels, according to the criminal complaint filed by U.S. Attorney, Paul Fishman. Patel, who lives in Edison, did not respond to requests for comment submitted via email and fax. He did not answer the door at his home.

The police have visited the Knights Inn more than 80 times over the past year, according to a log of emergency calls. They've been summoned to break up fights, investigate theft and make drug arrests.

"I don't feel safe," Grayson said. "The chick that was in here before me was a heroin user. When she hit a vein and the blood splattered, she never cleaned it. I had to wash her blood off the walls."

Sheehan said Special Response clients have social workers to address trouble at the motels.

"They shouldn't feel isolated," Sheehan said. "We go out and do visits to our clients at the motels. When we are aware of issues, we are in communication with the motel and the issues are addressed for the most part immediately. But certainly we need to know if there are other issues out there that maybe we're not aware of so that we can look into them."

Grayson said no one was stopped to check her room. She uses the dresser area as a kitchen, with a fridge, a microwave and a hot plate piled up amid slanted racks of shoes and bread. The television is boxed in with pantry items, Cheerios, minute rice, sugar and instant creamer. Dirty dishes go in the bathroom sink and shower.

"I've talked to my social worker there six times and complained," Grayson said. "When you complain, repercussions come back at you. The manager is meaner to you. But what are you going to do about it? You have nowhere else to go."

Borough officials are engaged in discussions about how to address the motel issue, Vaz said. The council, however, is holding off on action because Mayor Bill Akers is still mourning the loss of his son, who died of a suspected drug overdose in October.

"We're waiting for the right time when he's ready to come back," Vaz said. "A view from 35,000 feet, we have been trying to see what other towns that are similarly situated like Belmar, Ocean City, other communities that have seasonal housing and a seasonal tourism trade and see what their ordinances look like.

**Days of Mom and Pop**

Seaside Heights is Jersey's second poorest beach town north of Atlantic City, (Asbury Park is the poorest), according to a Census survey of per capita income. The year-round population is 2,887. On holiday weekends when the weather complies, more than 100,000 people visit, Camera said.

During Seaside's heyday, circa 1950, the motels were locally owned family businesses, Vaz said. He grew up in town – his father is councilman Tony Vaz – and wrote a 2010 book, "Seaside Heights: A Postcard History."

Working class vacationers used to check into dreamily named motels and spend a week or longer, said Vaz. It was busy enough during the summer for the businesses to shutter after Labor Day. A downturn took root during the late 1980's, when medical waste wash -ups and a sputtering economy coalesced to crush tourism, according to Vaz.

Mom and pop motels were sold off to investors from out of town and the new owners began taking in year-round tenants from social services, Vaz said.

"In the old days, the owner of a motel or apartment was also a fireman or a member of the American Legion or the Seaside Heights Italian American Club," said Vaz, whose parents used to run a motel called the Victoria Court.

(0m/share)

Vaz said, "The investor-owners don't have a connection to the community. They don't see the heavy burden in terms of municipal services, the police department as well as the school. The social services people typically aren't working, probably won't be able to get a job, especially in Seaside Heights because there's no jobs here in the wintertime and it brings domestic violence, it brings drugs and it brings other types of crime."

Seaside has more registered sex offenders per capita than any other town in Ocean County, according to City-Data.com, a website that measures community demographics.

"Our police department is aware of it," Camera said. "The general assistance people, the ones without children, the individuals, a larger percentage of them vs. the general public have had some sort of criminal issues in the past whether they're sex or drug related."

Dozens of sex offenders have cycled through Seaside motels the past decade, records indicate. During that time period, 21 rapes were reported in the borough, according to State Police statistics. Just one case, however, is known to have involved an offender. In 2007, a convicted rapist who was placed at the Knights Inn (then called the Atlantic Motel) sexually assaulted a woman in a neighboring room. No rapes have been reported in Seaside in 2014.

David "Wolf" Degroat, a moderate risk offender and former Travelodge tenant, said it took him years to get an apartment. He now lives with his fiancée, Fawn in a one-bedroom place a block from the beach.

"People with a sex offense label are cast out, ostracized, propagandized, harassed, defamed, slandered, beat up, attacked, all by people who are predisposed to judgment and discrimination," said Degroat, 44, who served six years in prison for having sex with a 14-year-old girl in 2005. He said he's been calling himself "Wolf" since he was a teenager, embracing the name after a peyote-induced spirit journey with a group of Native Americans in South Dakota.

"They refuse to open their eyes and see the person for who they are rather than the crime that they committed," Degroat said. "I don't judge the man by the mistake unless he's repeated that mistake too many times. I own the fact that I committed a crime by having sex with someone under the age of 18. I know who I am regardless of whatever label I carry."

Degroat is one of several Special Response tenants who said Patel, aka "Mr. P," put them to work and paid them in cash. Degroat said he watched over the Travelodge and doubled as maintenance man at two other Patel motels, the Cloud 9 and La Fontana. A woman sheltered at the Knights Inn gets $4 per room to clean after tourists check out, according to Grayson.

Sheehan said Special Response tenants are not supposed to be working at the motels.

"We encourage people to get jobs but we certainly want to make sure they're legitimate jobs and they're on the books," Sheehan said. "Part of our social service plan is to engage the clients, so if somebody is just at the motel all day, there's definitely something wrong with that scenario. There's things that they should be doing, whether they go to a program every day, whether they're in work activity every day. If somebody has a job on the side and is getting paid under the table and not reporting it to us, that is an issue."

The Wyndham Hotel Group, parent company of the Travelodge and the Knights Inn, has launched an investigation into the two motels.

"We consider guest safety and security to be of the utmost importance and as such, require that each of the independently owned and operated hotels within our franchise system comply with not only our own brand standards but also all local, state and federal laws," said Christine Da Silva, vice president of marketing communications, in a statement.

For all the stories of solitude and crisis in Seaside, there are counter narratives about kinship and altruism.

Patricia Forse, a widow and former nurse from Toms River, went homeless after her husband died of lung cancer. She said she lost everything in her fog of depression and was placed in motels for several miserable months before she found Heights Central, a rooming house Seaside.

It was an adjustment at first, living in the 14-room facility with four shared bathrooms and a view of bulldozers corralled around a Route 35 construction site. Forse said that the owner of Heights Central, Sal Rispoli, talked her through her difficulties and now she's embraced Seaside, for all its faults, as her permanent home.

"Seaside is jaded by mismanagement but you can't take away the beauty of the ocean and the beach," said Forse, 63. "It's always been crazy here. I used to think it was terrible but Seaside is growing on me. It's quirky and it's weird and I think it's always been a little daydream in my head to live at the beach."

# EXHIBIT G

(Page 1 of 21)

# WYNDHAM

## HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 • fax (800) 880-9445
www.wyndhamworldwide.com

February 3, 2015

**VIA 2 DAY DELIVERY METHOD**

Mr. Sandip Patel
Seaside Hospitality LLC
314 Bay Boulevard
Seaside Heights, NJ 08751

Re:     **NOTICE OF TERMINATION** of Franchise Agreement dated March 30, 2012, (the "Agreement") between Seaside Hospitality LLC, ("you" or "your") and Travelodge Hotels, Inc., ("we", "our" or "us") for the Travelodge® System Unit #46431-01908-1 located in Seaside Heights, NJ (the "Facility")

Dear Mr. Patel:

We write to give you formal notice of the termination of the Franchise granted under the Agreement to operate the Facility as part of the Travelodge System (the "Notice"). This termination is based on our reasonable judgment that you have materially damaged the goodwill associated with the System, due to your owner's felony conviction. The termination of your Agreement is effective as of April 6, 2015 (the "Termination Date").

Because the Agreement is terminating, you must perform your post-termination obligations such as the removal of all items that display or refer to the Travelodge brand at the Facility. The de-identification procedures are specified in the attachment to this letter. These de-identification procedures must be completed within ten (10) days from the Termination Date.

You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement through the Termination Date. We estimate that, as of February 2, 2015, you owe us $6,219.02 in Recurring Fees. This amount is described in more detail in the attached itemized statement. Additionally, you must pay us Liquidated Damages of $37,500.00 as specified in section 18.2 of the Agreement.

Please know that, because the Agreement will terminate, you will also lose the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. If the Facility has WynGuest system installed, please be advised that due to the termination you will have no functionality from the system. Should you wish to continue using an independent version of the software, please contact Sabre at 877-520-3646. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.











Mr. Sandip Patel
February 3, 2015
Page Two

If within the ten (10) day period described above, you do not timely remove the exterior signage which bears the Travelodge name and marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us. If you object to the removal of the signage by our independent contractor, you must notify us within ten (10) days of the Termination Date.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions regarding your obligations under this Notice, please contact Glenn Bisbing, Sr. Director of Settlements, at (973) 753-7479.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosures

cc:     Sandip Patel (Guarantor) – 300 Kimball Street, Woodbridge, NJ 07095
        Caryl Porter
        Glenn Bisbing
        Joe Maida
        Michael Piccola

## ITEMIZED STATEMENT

Report Date: 02-Feb-2015

| | |
|---|---|
| As of Date (DD-MMM-YYYY) | : 02-Feb-2015 |
| Customer No | : 46431-01906-01-TRA |
| Category Set | : |
| Category Group | : |
| Group No | : |
| Bankruptcy | : No Bankruptcy Sites |
| Disputed | : No |
| Finance Charges Included | : Yes |
| | |
| Customer No | : 46431-01906-01-TRA |
| Address | : 314 Bay Blvd.,Seaside |
| | Heights,NJ,08751,US |
| As of Date | : 02-Feb-2015 |



| Month/Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Paid | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| SEP-2013 | 42662240 | 09/30/2013 | Actual-1000A-ROYALTY FEE | | 816.20 | 0.00 | 178.33 | 994.53 |
| | 42662241 | 09/30/2013 | Actual-1211A-TIMA | | 723.80 | 0.00 | 158.16 | 881.96 |
| | | | | Sub Total: | 1,540.00 | 0.00 | 336.49 | 1,876.49 |
| FEB-2014 | 30893432 | 02/27/2014 | Remedial Training | | 250.00 | 0.00 | 35.90 | 285.90 |
| | 42801450 | 02/28/2014 | Actual-1211A-TIMA | | 493.50 | 0.00 | 70.57 | 564.07 |
| | 42802654 | 02/28/2014 | Actual-1000A-ROYALTY FEE | | 556.50 | 0.00 | 79.59 | 636.09 |
| | | | | Sub Total: | 1,300.00 | 0.00 | 186.06 | 1,486.06 |
| MAR-2014 | 42831774 | 03/31/2014 | Actual-1000A-ROYALTY FEE | | 556.50 | 0.00 | 70.96 | 627.46 |
| | 42831880 | 03/31/2014 | Actual-1211A-TIMA | | 493.50 | 0.00 | 62.92 | 556.42 |
| | | | | Sub Total: | 1,050.00 | 0.00 | 133.88 | 1,183.88 |
| SEP-2014 | 10782641 | 09/04/2014 | GUEST SRVCS TRANSACTION CHARGE | | 180.00 | 0.00 | 7.84 | 187.84 |
| | | | | Sub Total: | 180.00 | 0.00 | 7.84 | 187.84 |
| JAN-2015 | 43106426 | 01/31/2015 | 5034A-WYNGUEST SUBSCRIPTION | | 425.00 | 29.75 | 0.00 | 454.75 |
| | 43115151 | 01/31/2015 | Accrual-1000A-ROYALTY FEE | | 556.50 | 0.00 | 0.00 | 556.50 |
| | 43115152 | 01/31/2015 | Accrual-1211A-TIMA | | 493.50 | 0.00 | 0.00 | 493.50 |
| | | | | Sub Total: | 1,475.00 | 29.75 | 0.00 | 1,504.75 |
| | | | | Grand Total: | 5,525.00 | 29.75 | 664.27 | 6,219.02 |

Page 1 of 2

Requested By:  Kristine Violette

· Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1.  Remove, replace or cover with an opaque cover the primary Facility signage.

2.  Remove all interior signage that contains Travelodge Marks.

3.  Change advertising billboards to remove Travelodge Marks.

4.  Stop answering Facility telephone as Travelodge guest lodging facility.

5.  Remove Travelodge name and Marks from any domain name, advertising and brochures.

6.  Return to us all confidential operations and training manuals.

7.  Remove the Travelodge name and Marks from the following items:

        Stationery, pads and pens
        Directories and brochures
        Business cards
        Folios and registration cards
        Do-not-disturb cards
        Comment cards
        Telephone plates
        Telephone dialing instructions
        TV channel ID plates
        Rate/law cards
        Door signage
        Soap/shampoo
        Key tags
        Credit card imprinter
        Laundry bags
        Name tags/uniforms
        Ice buckets/trays
        Ashtrays/matches
        Plaques
        Guest checks/receipts
        Menus

8.  Paint over or remove any distinctive Travelodge trade dress, paint schemes or architectural features.

9.  It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Travelodge facility.

10. We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

UPS CampusShip: Shipment Receipt                                                    Page 1 of 1



**Shipment Receipt**

Transaction Date: 02 Feb 2015                      **Tracking Number:**        1Z22445X0299080224

**1 | Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Seaside Hospitality LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Mr. Sandip Patel | Kristine Violetta | Kristine Violetta |
| 314 Bay Boulevard | 22 Sylvan Way | 22 Sylvan Way |
| SEASIDE HEIGHTS NJ 087512410 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Residential | Telephone:9737537204 | Telephone:9737537204 |

**2 | Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| | | | Reference # 1 - 006-1696 |
| 1.  Letter<br>(Letter billable) | UPS Letter | | |

**3 | UPS Shipping Service and Shipping Options**

| | |
|---|---|
| **Service:** | UPS 2nd Day Air |
| **Shipping Fees Subtotal:** | 22.52 USD |
| Transportation | 14.40 USD |
| Fuel Surcharge | 1.07 USD |
| Residential Surcharge | 3.50 USD |
| Delivery Area Surcharge | |
| Package 1 | 3.55 USD |

**4 | Payment Information**

| Bill Shipping Charges to: | Shipper's Account 22445X | |
|---|---|---|
| | | 22.52 USD |
| Charges: | | |
| **A discount has been applied to the Daily rates for this shipment** | | |
| | | 13.04 USD |
| Negotiated Charges: | | 13.04 USD |
| Total Charges: | | |

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

UPS CampusShip: Shipment Receipt

Page 1 of 1

 **Shipment Receipt**

**Transaction Date: 02 Feb 2015**          **Tracking Number:**          1Z22445X0296291832

**1  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Seaside Hospitality LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Sandip Patel | Kristine Violette | Kristine Violette |
| 300 Kimball Street | 22 Sylvan Way | 22 Sylvan Way |
| WOODBRIDGE NJ 070952513 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| | Telephone:9737537204 | Telephone:9737537204 |

**2  Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1. Letter | UPS Letter | | Reference # 1 - 006-1696 |
| (Letter billable) | | | |

**3  UPS Shipping Service and Shipping Options**

| Service: | UPS 2nd Day Air |
|---|---|
| Shipping Fees Subtotal: | 15.12 USD |
| Transportation | 14.40 USD |
| Fuel Surcharge | 0.72 USD |

**4  Payment Information**

| Bill Shipping Charges to: | Shipper's Account 22445X | |
|---|---|---|
| Charges: | | 15.12 USD |
| **A discount has been applied to the Daily rates for this shipment** | | |
| Negotiated Charges: | | 6.93 USD |
| Total Charges: | | 6.93 USD |

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

# EXHIBIT H

tripadvisor

Overview   Reviews (58)   Photos (22)   Location   Amenities   Q&A   Room Tips (8)   JOIN   LOG IN   Show Prices

Seaside Heights, New Jersey, United State   What are you looking for?   Search

United States  ›  New Jersey (NJ)  ›  Jersey Shore  ›  Seaside Heights  ›  Seaside Heights Hotels

# Travelodge Seaside Heights

58 Reviews   #40 of 42 Hotels in Seaside Heights

314 Bay Blvd, Seaside Heights, NJ 08751 (Formerly Village Inn)   Hotel amenities



**Professional photos**

24 traveler photos

Enter dates for best prices

**Book on** tripadvisor

Check In

**Show Prices**

possible

Compare best prices from  Secure payments. We use
industry-leading practices

Expedia   travelocity   Booking.com

and 6 more sites!

**Ranked #40 of 42**
Hotels in Seaside Heights

58 Reviews

# 58 Reviews from our TripAdvisor Community

Add Photo

Explore similar hotels

Your overall rating of this property

Click to rate

| Traveler rating | | See reviews for | | Rating summary | |
|---|---|---|---|---|---|
| Excellent | 4 | Families | 25 | Location | |
| Very good | 4 | | | Sleep Quality | |
| Average | 2 | Couples | 8 | Rooms | |
| Poor | 4 | Solo | 2 | Service | |
| Terrible | 41 | Business | 0 | Value | |
| | | | | Cleanliness | |

*Traveler tips help you choose the right room.*   Room tips (8)

58 reviews sorted by  Date   Rating   Season   All months   English first



Darsyvonne945

*"Shockingly Dirty!!"*

Reviewed 1 week ago   via mobile

A few weekends ago there was a music festival I was attending and this place was the only "decently" priced inn. When we got there to check in the guy was friendly. But that's the only positive thing about it. We got upstairs and we could not believe the condition of this room. The rugs are covered in dirty and paint stains. As well as he table and chairs. The beds wore on another level of disgusting. There were yellow and mildew stained. The headboard had a layer of dust. I swear they haven't cleaned that room in God knows how long. There were beer bottle caps all over. And rusty nails on the floor by the taped up sliding window doors. Not one towel. and a half used toilet paper roll. We didn't even feel comfortable showering there. Had to use alcohol swabs to clean the toilet to piss. We went out and bought Baja blankets to cover the bed b/c we couldn't even sit on them w/o feeling gross. Turn the airconditioner on at your own risk of roaches flying out. And when I went to check out the next day there was a sign that said "come back in 10 min" so I did... The sign was still there. Then I walked to the other side of the office were there was an open door and found the dude asleep behind the counter... Nice. I DO NOT THINK THIS PLACE SHOULD BE OPEN.



Show Prices



Show Prices



Show Prices

See all Seaside Heights hotels

**Browse nearby**

Hotels (42)|  Restaurants (48)| Things to Do (11)

  

Overview | Reviews(5... | ... Photos(2) | ... Local... | Amenities | Q&A | Room Tips (8)

 Show Prices

Stayed June 2015, traveled as a couple

Less

Was this review helpful?   Yes

Ask Sarayvonne345 about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.



travelmybn
Wildwood, New Jersey

### *"Must Read Article on Hotel"*
Reviewed January 2, 2015

Check out the article on NJ.com 12:29:14

The sex offender in room 13: Behind the doors of Seaside Heights' welfare motels. (internet search)

By Lisa Rose | NJ Advance Media for NJ.com
updated December 29, 2014 at 2:58

During the winter in Seaside Heights, the gentle ocean breeze gives way to lashing wind and the December sun shines mockingly bright, with a false promise of warmth ... Read the full article to be enlightened.

Stayed December 2014, traveled with family

Less

Was this review helpful?   Yes   1

See all 3 reviews by travelmybn for Seaside Heights
Ask travelmybn about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.

### Travelers are raving about these Seaside Heights hotels

    

Bay Breeze Motel    Sunrise Motel    Palm Villa Suites    Seaside Colony ...    Sunburst Motels

Show Prices    Show Prices    Show Prices



Joe_Zlomek
Saratoga, Pennsylvania

### *"The worst Wyndham franchisee ever"*
Reviewed September 3, 2014

An ancient and poorly maintained property. No working AC; fans supplied. Inadequate parking; you must p**k on street instead. Noisy and unappealing.

Stayed August 2014, traveled as a couple

Value
Location
Sleep Quality

Rooms
Cleanliness
Service

Review collected in partnership with Travelodge

Was this review helpful?   Yes   2

Ask Joe_Zlomek about Travelodge Seaside Heights

This review is the subjective opinion of an individual traveler and not of TripAdvisor LLC nor of its partners.

GM08751, Manager at Travelodge Seaside Heights, responded to this review September 15, 2014

I deeply regret to learn that you found our hotel to be so substandard as to be termed "ancient and poorly maintained property." Thank you for your honest feedback which will promote practical policy changes and an improved experience for future guests. I hope that we will impress you with exemplary service during future visits.

Report response as inappropriate
This response is the subjective opinion of the management representative and not of TripAdvisor LLC nor of its partners.


PAY SECURELY HERE, THERE, EVERYWHERE


 Sign Up for Free


PayPal

**Seaside Heights Hotels NJ**
www.booking.com/Seaside-Heights-Hotels Lowest price guaranteed Book a Hotel in Seaside Heights NJ

Sponsored links

### Explore Seaside Heights

Seaside Heights Bed and Breakfast
Seaside Heights Hotel Deals
Seaside Heights maps
Seaside Heights Motels
Newark Liberty Intl Airport Hotels
John F. Kennedy Intl Airport Hotels
La Guardia Airport Hotels
Hotels near Capri Institute Cosmetology
Hotels near OCVTS
Hotels near Ocean County College
Hotels near Performance Training Institute Inc
Hotels near Star Career Academy

### Popular Hotels

 Belmont Motel
4.0 out of 5, 274 reviews
Last reviewed Jun 23, 2015

 Sunburst Motels I & II
4.5 out of 5, 148 reviews
Last reviewed Jun 23, 2015

 Coral Sands Motel
3.0 out of 5, 29 reviews
Last reviewed Jun 20, 2015

 Charlroy Motel
3.5 out of 5, 63 reviews
Last reviewed Jun 19, 2015

 Sunset Motel
3.5 out of 5, 44 reviews
Last reviewed Jun 19, 2015

 Seaside Colony Motel
4.5 out of 5, 112 reviews
Last reviewed Jun 17, 2015

 Desert Palm Inn
3.0 out of 5, 88 reviews
Last reviewed Jun 16, 2015

 Hershey Motel
3.0 out of 5, 57 reviews
Last reviewed Jun 15, 2015

 Mark III Motel
3.5 out of 5, 22 reviews
Last reviewed Jun 11, 2015

 Sea Palace Inn
3.5 out of 5, 63 reviews
Last reviewed Jun 9, 2015




*"Travelodge at seaside heights ni"*

Reviews(58)    Photos(32)    Location    Amenities    Q&A    Room Tips    Show Prices

Reviewed September 16, 2014



Seaside Best Rentals
5.0 out of 5, 52 reviews
Last reviewed Jun 9, 2015

This place is the worse ever I have been in motel !
It reeks in room. bathtub is so dirty !
smoke alarm kept going off , too loud, wake me up all morning.
The pillow smells awful !
I would not recommend anyone in this motel !
I want my money back !

Stayed August 2014, traveled with family

Value                Rooms
Location             Cleanliness
Sleep Quality        Service

Review collected in partnership with Travelodge

Was this review helpful?  Yes  1

Ask sjd7771562 about Travelodge Seaside Heights

This review is the subjective opinion of an individual traveler and not of TripAdvisor LLC nor of its partners.


Sand 'n Sun Motel
3.5 out of 5, 15 reviews
Last reviewed Jun 8, 2015


Econo Lodge - Seaside Heights / Toms River
3.5 out of 5, 43 reviews
Last reviewed May 25, 2015

Buoy 16 Motel
3.0 out of 5, 68 reviews
Last reviewed May 19, 2015

Sea Palace Motel
2.5 out of 5, 18 reviews
Last reviewed Apr 15, 2015

**GM08751, Manager at Travelodge Seaside Heights, responded to this review, September 15, 2014**

I am so sorry to hear that your most recent stay with us did not meet your expectations of quality service, accommodations and hospitality. Thank you for sharing your experience so that we can benefit from your perspective of our hospitality and services. I do thank you for bringing this matter to our attention and I assure you that we are correcting this issue for improved convenience in future visits.

Report response as inappropriate

This response is the subjective opinion of the management representative and not of TripAdvisor LLC nor of its partners.

### Explore the World

Hotels

Pellston Lodge Magnuson Hotel
4 out of 5, 81 reviews
Last reviewed May 27, 2015

Candlewood Suites Richmond Airport
4.5 out of 5, 184 reviews
Last reviewed Jun 23, 2015

Hilton Garden Inn Panama City
4 out of 5, 278 reviews
Last reviewed Jun 10, 2015

American Country b&b
5 out of 5, 180 reviews
Last reviewed Jun 23, 2015

Royal Palms Resort and Spa in Phoenix
4.5 out of 5, 981 reviews
Last reviewed Jun 17, 2015

Omni La Mansion del Rio in San Antonio
4.5 out of 5, 2,081 reviews
Last reviewed Jun 24, 2015

Travel Destinations

Puerto Plata Hotels
44 Hotels, 37,399 Reviews

Panama City Beach Hotels
45 Hotels, 29,010 Reviews

Peoria
22 Hotels, 3,359 Reviews

San Diego
272 Hotels, 143,347 Reviews



M1093JWjoanna
Red Hook, New York, United States

*"Don't do it"*

Reviewed August 25, 2014

The pictures on the website must be 20yrs old there was mold in the bath rooms, stains on the sheets. our socks turned black walking across the rug the pool was closed by the ocean county board of health and the staff removed the notice and opened the pool the night manager got drunk every nite and would start fights with hotel guests the cops were there every day. when it rained the ceiling leaked so bad it filled a coffee cup in ten min and soaked two suitcases, we had drug deals going on next door and women of the night my niece had the shower door fall off, can't believe whyndam would allow this hotel in there chain the place needs to b knocked down

**Room Tip:** Pick a different hotel there are plenty in the area
See more room tips

Stayed August 2014, traveled with family

Less

Was this review helpful?  Yes  1

Ask M1093JWjoanna about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.

**GM08751, Manager at Travelodge Seaside Heights, responded to this review, September 15, 2014**

I am so disappointed to hear that you were so dissatisfied with our accommodations and services and that our rating for your experience is so low. It is very important to us to address these sorts of issues right away and to ensure that you are able to enjoy the rest of your stay. It is our primary aim to give you a five star experience and it is disheartening to hear that this is not the impression we left you with. I hope you will accept our sincerest apologies for the service that you did not receive regarding the necessity of correcting such issues as quickly as possible. I hope you will change your mind about seeking out new accommodations in the area and that you'll give us another chance to change your perception of our hotel.

Report response as inappropriate

This response is the subjective opinion of the management representative and not of TripAdvisor LLC.



*"Heed This Warning. Stay away"*

Reviewed August 24, 2014

---

Harry P
Rhinebeck, New York

Reviews(59)   Photos(22)   "Location"   Amenities   Q&A   Room Tips (8)

Show Prices

Upon arriving after a 4 hr drive this hotel should be condemned!! This is not the lovely picture. Upon length we spent from some breakfast we happened. Cops showing up. shower doors falling off dirty feet from floor. baaaaaddd leak on second floor from ceiling due to rain. Asked clerk to change room said they couldnt do that untill we had to almost get into an altercation. Kids seen about a dozen open drug deals. Noone bothered to say that it is a welfare housing unit. Several prostitues working the rooms. Just plain nasty as for continental breakfast goes. tasty-o's and sour milk on counter does nt cut it. Called wyndam services as we are going to pursue this matter.

Stayed August 2014, traveled with family

| | |
|---|---|
| Location | Rooms |
| | Service |

Less

Was this review helpful?  Yes  1

Ask Harry P about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.

GM08751, Manager at Travelodge Seaside Heights, responded to this review, September 15, 2014

I deeply regret to learn that you found this experience to be so terrible due to issues that should have been immediately addressed. I am very sorry to hear that you encountered such unusual circumstances and inconveniences during your most recent experience with us, especially that we were not able to address the issues and misunderstandings right away. I assure you that each issue mentioned is being investigated and addressed and we thank you for taking the time to point out the areas where we can improve upon the guest experience. I hope you will return to give us the opportunity to change your perception of our breakfast and services.

Report response as inappropriate

This response is the subjective opinion of the management representative and not of TripAdvisor LLC.



Watae S

### "Very bad don't go there"
Reviewed August 18, 2014

worst place that I Ever stayed in my life the room smells and very very dirty. No parking lot the pictures are all fake the place does not even look any where near what they have on there Web site I would never recommend this place to no one . customers service the worst, there is no Garbage can no where in the room. lcof off noise until 4 in the morning from the room next to me they were drunk people and one say nothing to them because there was no security worse night every please don't go there.

Stayed August 2014

| | |
|---|---|
| Value | Rooms |
| Location | Cleanliness |
| | Service |

Less

Was this review helpful?  Yes  2

Ask Watae S about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.

GM08751, Guest Relations Manager at Travelodge Seaside Heights, responded to this review, August 20, 2014

I am sorry to hear that you were displeased with your recent stay. We pride ourselves in the highest level of quality service with comfortable accommodations and are saddened to hear that you were not completely satisfied. We appreciate your business, and hope to have another chance to live up to the standards you expect and deserve.

Report response as inappropriate

This response is the subjective opinion of the management representative and not of TripAdvisor LLC.



A G
Easton, Pennsylvania

### "Worse Hotel Ever!!!!!"
Reviewed August 18, 2014

This hotel is the worse hotel I've ever stayed in!! As soon as we open the door into our room. the smell of cigarette smoke filled the room that someone tried to cover up by spraying cologne which only made it worse. (suppose to be non-smoking room) The roof had leaked at some point causing a 3'x3' hole in the ceiling. It had black and white mold

Overview    Reviews(59)    Photos    Location    Reviews and advice on    Room Tips (8)    Show Prices

covering it. My husband went down and told the guy and he said he'd have someone come look right away. No one ever showed up. Never did we received an apology or any kind of "how can we make this up to you". Upon checking out I seen another patron who expressed he would never stay at this hotel again as he drove 4 hours to get there and now deeply regrets it. My advice to anyone going to Seaside Heights - Steer clear of this hotel (ESPECIALLY Room 313), you will regret it as I and obviously other patrons have!

Stayed August 2014, traveled with family

Sleep Quality        Rooms
                     Service

Less

Was this review helpful?   Yes

Ask S C about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.

GM08751, Manager at Travelodge Seaside Heights, responded to this review,August 24, 2014

Unfortunately, despite our efforts to ensure that nobody smokes in non-smoking rooms, it does occasionally happen and I hope you'll accept our sincerest apologies for the smell of smoke that you experienced. I deeply regret to learn that you found this experience to be so terrible due to issues that should have been immediately addressed. Your comments are important to us as we continuously seek ways to improve upon the guest experience in our hotel. We hope you'll return someday to see how we're improving.

Report response as inappropriate

This response is the subjective opinion of the management representative and not of TripAdvisor LLC.



### "Should be condemned!!"
Reviewed August 17, 2014

I booked a one night stay at the hotel using an online booking app. The pictures seemed ok and for $129/night in a reputable hotel just a couple of blocks away from the ocean. How could I go wrong? Well it started when there was no parking and I had to park a block down the street and walk back in the rain. Then to get into the room, I had to use my shoulder to get the door open. How are my kids supposed open the door incase of an emergency? Once the was open and we went in, it smelt like a sewer. The bathtub was filthy, the drain cover was missing and there was someone else's leftover bar of soap. The bathroom was very small. It only had the bathtub and a toilet. The sink and mirror was in the room itself. As I mentioned earlier that it was raining that night, it was also leaking from the ceiling of our room. I went down to the front desk to mention to the so called clerk(looked as if he just walked off the street) that there was a leak. He told me not to worry and it and put a garbage bag on the carpet. The A/C was so loud that you can hardly hear each other talking. The beds were very uncomfortable and the pillows were as flat as a pancake. As for the pool. It was cloudy and couldn't see the bottom. The carpeting around the pool was coming off and some of it was ripped up and bunched in the corner. It was very unsafe for the kids. I would not let my worst enemy stay at this place. I will be filing a complaint with travelodge and let them see the pictures I had taken



Stayed August 2014

Less

Was this review helpful?   Yes

Ask Dave P about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.

GM08751, Guest Relations Manager at Travelodge Seaside Heights, responded to this review,August 20, 2014

I regret to discover that you weren't thoroughly impressed with us during your most recent stay. We appreciate that you have taken the time to let us know how you perceived our accommodations and we will take this information in order to make appropriate changes to better serve future guests.

Report response as inappropriate

This response is the subjective opinion of the management representative and not of TripAdvisor LLC.

Overview    Reviews(58)    Photos(32)    Location    Amenities    Q&A    Room Tips (8)          Show Prices

"One Chalked to Experience"
Reviewed August 18, 2014

HenryB
Wilmington, Delaware

Upon arrival they were police evicting one tank-top nicotine stained
employees, it made me feel like I was watching cops live. Ok, upon
entering the room, (non smoking) it stank like cigarettes ... inspected the
bed, there was a hole in the bottom sheet, looked in the shower, hair
stuck to the sides.... went to office and asked for another sheet. I was
told to go see one of three gentleman sitting around a table in a
courtyard that was not out of place in some town in India, ( where I have
traveled several times and perhaps the source of my tolerance). The
gentleman told me and I quote, "that is the only lot that bed, I've
asked him to buy them but they won't", he and the other two men are
somewhat irritated that I'm disturbing them. I thought to myself oh my
god I've been fleeced I can't believe how much I paid for this room  but I
decided just go out and get drunk so I don't care. Last item is the bed
has collapsed in the middle and was broken when I left in a purposeful
haze. If you're looking for adventure this awaits you.......

Stayed August 2014, traveled with friends

Less

Was this review helpful?   [ Yes ]                              ﹪

Ask HenryB about Travelodge Seaside Heights

This review is the subjective opinion of a TripAdvisor member and not of TripAdvisor LLC.

GM08751, Guest Relations Manager at Travelodge Seaside Heights, responded
to this review, August 20, 2014

Thank you for bringing to our attention your experience  and comments regarding
your stay in
our hotel. It is disturbing to hear about what you encountered and not at all to our
standards. Please know that we take this very seriously and will ensure appropriate
action is taken. Thank you for your business and we hope to serve you again!

Report response as inappropriate
This response is the subjective opinion of the management representative and not of
TripAdvisor LLC.

Previous          1     2     3     4     5     6                [ Next ]

Questions? Get answers from hotel staff and past guests.          [ Ask a question ]

## 32 photos of this hotel

**Traveler photos: See what travelers like you saw**
Viewed
All traveler photos(24)
Viewed
Hotel & grounds(1)
Viewed
Bathroom(1)
Viewed
Room/suite(4)
Viewed
Other(18)
**Management photos: Courtesy of the property manager**
Viewed
All management photos(9)
Viewed
Pool/beach area(2)
Viewed
Room/suite(3)
Viewed
Hotel & grounds(1)
Viewed
Other(2)

Check In          Check Out          Prices are for 1 room, 2 adults

## Hotels you might also like...

Also consider these accommodations in or near Seaside Heights
Green, Budget, Pool, Beach, Quiet 0.6 mi away  Show More Independent Hotels, Fitness cente...5.3 mi awayShow More Pool, Beach, Independent Hotels ..0.4 mi away  Show More

Days Inn - Toms River / Seaside
Heights (5B)
#5 of 42 in Seaside Heights
228 reviews

Overview          Photos(32)

Show Prices

TR Hotel
#1 of 29 in Toms River
437 reviews

Amenities          Q&A

Show Prices

Belmont Motel
#20 of 42 in Seaside Heights
274 reviews

Room Tips(16)

Show Prices

Show Prices

Pool, Independent Hotels, Best Va... 0.2 mi awayShow More Budget, Pool, Beach, Independent...0.3 mi awayShow More Free Parking, Budget, Pool, Beach...0.5 mi awayShow More

Bay Breeze Motel
#4 of 42 in Seaside Heights
168 reviews

Show Prices

Franklin Terrace Motel
#7 of 42 in Seaside Heights
64 reviews

Show Prices

Econo Lodge - Seaside Heights /
#15 of 42 in Seaside Heights
43 reviews

Show Prices

## Near Travelodge Seaside Heights



Top-rated Attractions Nearby

131 Reviews
Casino Pier & Breakwater Beach Waterpark

128 Reviews
Seaside Park Beach

20 Reviews
The Music Man

Browse all attractions.

Top-rated Restaurants Nearby

75 Reviews
Bobber's Family Restaurant

149 Reviews
Klee's Bar and Grill

7 Reviews
Bippy's Pizzeria and More

Browse all restaurants.

Questions? Get answers from hotel staff and past guests.

Ask a question

## Amenities

Highlights
Pool
Beach
Free Internet
Fitness Center with Gym / Workout Room
About the property
Beach
Things to do
Pool
Fitness Center with Gym / Workout Room
Room types
Non-Smoking Rooms
Internet
Free Internet

Official Description (provided by the hotel)
Conveniently located near the pier & beach, peaceful living accommodations with excellent friendly service & affordable
rates.

Additional Information about Travelodge Seaside Heights
Address 314 Bay Blvd, Seaside Heights, NJ 08751 (Formerly Village Inn)
Location United States > New Jersey > Jersey Shore > Seaside Heights
Price Range (Based on Average Rates) $
Hotel Class 1.5 star — Travelodge Seaside Heights 1.5*
Number of rooms: 51
Reservation Options
   TripAdvisor is proud to partner with Expedia, Travelocity, Booking.com, Cheap Tickets, Orbitz, Odigeo, TripOnline SA,
   hotels.com and Priceline so you can book your Travelodge Seaside Heights reservations with confidence. We help
   millions of travelers each month to find the perfect hotel for both vacation and business trips, always with the best
   discounts and special offers.
Hotel Style:
   #15 On the Beach Hotel in Seaside Heights
Owners What's your side of the story?
Register now for free — and start getting automatic notification of new reviews, responding to traveler feedback,
adding new photos to your listing and much more.

Manage your listing

## Questions & Answers

Questions? Get answers from Travelodge Seaside Heights staff and past
guests.

Overview   Reviews (58)   Photos (32)   Location   Amenities   Q&A   Room Tips (8)   Show Prices

✓ Get notified about new answers to your questions.

Posting guidelines

Ask

Typical questions asked:

Can tickets for local attractions be purchased at the front desk?

Do you have to pay extra for a mini-fridge?

At what time does the pool open each day?

See which rooms travelers prefer

# EXHIBIT I



# WYNDHAM
## HOTEL GROUP

Legal Department
22 Sylvan Way
Parsippany, New Jersey 07054
Phone (973) 753-6000
Fax (973) 753-4748
Jennifer.Constantinou@wyn.com

May 27, 2015

<u>VIA UPS</u>

Seaside Hospitality, LLC
Attn: Sandip Patel
300 Kimball Street
Woodbridge, New Jersey 07095

Village Inn, LLC
314 Bay Boulevard
Seaside Heights, New Jersey 08751

Re:  **Demand to Cease and Desist Ongoing Infringement of Travelodge Hotels, Inc.'s Trade Name and Service Marks at Facility located at 314 Bay Boulevard, Seaside Heights, NJ, Former Travelodge Site No. 46431-01908-01 (the "Facility")**

Dear Sir/Madam:

I write on behalf of the Legal Department of Travelodge Hotels, Inc. ("THI"). It has been brought to THI's attention that you are operating the above-referenced Facility under the name "Travel Inn," in flagrant violation of THI's trademark rights. We write to demand that you immediately cease and desist the misuse of the Travelodge® trade name, trademarks or service marks (collectively, the "Travelodge® Marks"), and/or names and marks that are confusingly similar to the Travelodge® Marks, and cease to misrepresent that you have a relationship with THI. Specifically, by way of example and not limitation, signage bearing the Travelodge® Marks, font, colors, and logo, in conjunction with use of the word "Travel," is located at the Facility, on nearby highways, and in the Facility's public areas, all within view of the traveling public.

The Franchise Agreement between Seaside Hospitality, LLC ("Seaside") and THI was terminated effective April 6, 2015. Pursuant to the Franchise Agreement, the Facility was required to immediately cease the use of all Travelodge® Marks. Since the termination of the Franchise Agreement, the Facility has used the Travelodge® Marks without authorization to rent rooms through, among other things, failure to remove signage bearing the Travelodge® Marks throughout the Facility.

THI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services. THI owns and has the exclusive right to license the use of the Travelodge® Marks, as well as the distinctive Travelodge® System, which provides hotel services to the public under the Travelodge® name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services. THI or its predecessors have continuously used each of the Travelodge® Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

THI prides itself on the quality of its services, its reputation for quality, and the very substantial goodwill that has become attributable to it. THI has spent substantial sums in development and promotion of the goodwill associated with the Travelodge® Marks, and views them as substantial proprietary assets. Because of substantial use and promotion, the Travelodge ® Marks have become famous marks afforded a broad scope of protection under United States and international trademark law.

Your continued misrepresentations and unauthorized use of the Travelodge® Marks constitutes counterfeiting, trademark infringement, unfair competition, and dilution in violation of the federal United States Trademark Act, 15 U.S.C. §1051, et. seq., and additionally constitutes trademark infringement, unfair competition and dilution in violation of state and common law. This infringement is: 1) causing confusion among the public as to the affiliation of the Facility with the Travelodge® System; and 2) damaging contractual relations between THI and its legitimate licensees. This has caused dilution and disparagement of the distinctive quality of the Travelodge® Marks and lessened the capacity of the Travelodge® Marks to identify and distinguish the goods and services of THI, all in violation of Section 43(c) of the Lanham Act.

Please be advised that should you fail to cease and desist (1) using all Travelodge® Marks, font, colors, and logo; (2) displaying signage confusingly similar to the Travelodge® Marks; and (3) otherwise identifying the Facility as a "Travel Inn," THI will initiate litigation against you, immediately move for injunctive relief, and seek to recover damages which, under the Lanham Act, may include an award of treble damages and attorneys' fees and/or statutory damages of up to $1 million for each registered mark still in use at the Facility. See 15 U.S.C. § 1114, et seq.

Accordingly, THI demands you immediately remove any and all exterior and interior items displaying the Travelodge® Marks and/or use of "Travel Inn." THI will be sending a representative to the Facility shortly to ensure that you are in compliance with these requirements. You must contact us within five (5) days from the date of this letter to confirm that you will comply with all demands set forth herein. Absent written assurance from you of your compliance with THI's demands, as stated above, THI will take all measures afforded to it at law and in equity to enforce its intellectual property rights.

The foregoing is not intended, nor shall it be construed, as a complete recitation of the facts and events concerning the above-referenced matter, or the law or claims of THI in the event filings are made with respect thereto, nor shall it be construed as a complete recitation of any of your rights, claims, damages or remedies, legal or equitable. Nothing hereinabove stated or omitted shall be deemed a waiver or limitation of any right, remedy, claim, or cause of action of any kind whatsoever, all of which THI hereby expressly reserves. This letter is written without prejudice to any claims

which THI may have against you and/or related entities, including but not limited to injunctive relief and money damages, should action against you prove necessary.

Very truly yours,

Jennifer E. Constantinou
Vice President - Litigation



# EXHIBIT J

AO 245B (Mod. D/NJ 12/06) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

    v.

Case Number    2-Cr. 14-508 (1)

SANDIPKUMAR PATEL

    Defendant.

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant, SANDIPKUMAR PATEL , was represented by Eric R. Breslin, Esq .

The defendant pled guilty to count(s) 1 and 2 of the INFORMATION on September 4, 2014.  Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18 USC 371 | Conspiracy to Defraud the US | From May 2001 through May 2009 | 1 |
| 26 USC 7206(1) | Subscribing to a False Tax Return | October 13, 2008 | 2 |

As pronounced on JUNE 2, 2015, the defendant is sentenced as provided in pages 2 through 7 of this Judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay to the United States a special assessment of $200, for count(s) 1 & 2, which shall be due immediately.  Said special assessment shall be made payable to the Clerk, U.S. District Court.

It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

Signed this the _____3_____ day of JUNE , 2015.

Hon. WILLIAM H. WALLS
Senior United States District Judge

08820

AO 245B (Mod. D/NJ 12/06) Sheet 2 - Imprisonment

Judgment – Page 2 of 7

Defendant:    SANDIPKUMAR PATEL
Case Number:    2-Cr. 14-508 (1)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 30 Months, On each of counts 1 & 2 to run concurrently.

The Court makes the following recommendations to the Bureau of Prisons: Court recommends that the BOP designate an institution as near as possible to the home address of defendant.

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons August 3, 2015 at 9:30 a.m. .

## RETURN

I have executed this Judgment as follows:

_____
_____
_____
_____

Defendant delivered on _____  To _____

At _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

AO 245B (Mod. D/NJ 12/06) Sheet 3 - Supervised Release

Judgment – Page 3 of 7

Defendant:     SANDIPKUMAR PATEL
Case Number:   2-Cr. 14-508 (1)

### SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 2 years.

Within 72 hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which the defendant is released.

While on supervised release, the defendant shall comply with the standard conditions that have been adopted by this court as set forth below.

Based on information presented, the defendant is excused from the mandatory drug testing provision, however, may be requested to submit to drug testing during the period of supervision if the probation officer determines a risk of substance abuse.

If this judgment imposes a fine, special assessment, costs, or restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine, assessments, costs, and restitution that remains unpaid at the commencement of the term of supervised release and shall comply with the following special conditions:

COOPERATION WITH THE INTERNAL REVENUE SERVICE

You are to fully cooperate with the Internal Revenue Service by filing all delinquent or amended returns within six months of the sentence date and to timely file all future returns that come due during the period of supervision. You are to properly report all correct taxable income and claim only allowable expenses on those returns. You are to provide all appropriate documentation in support of said returns. Upon request, you are to furnish the Internal Revenue Service with information pertaining to all assets and liabilities, and you are to fully cooperate by paying all taxes, interest and penalties due, and otherwise comply with the tax laws of the United States.

NEW DEBT RESTRICTIONS

You are prohibited from incurring any new credit charges, opening additional lines of credit, or incurring any new monetary loan, obligation, or debt, by whatever name known, without the approval of the U.S. Probation Office. You shall not encumber or liquidate interest in any assets unless it is in direct service of the fine and/or restitution obligation or otherwise has the expressed approval of the Court.

OCCUPATIONAL RESTRICTIONS

As a further special condition of supervised release, the defendant is to refrain from To refrain from alien sponsorship, through employment relationships.
(2) years, term of supervised release.

*{As an underlying foundation for this special condition, the Court must find that: (1) a reasonably direct relationship existed between the defendant's occupation, business or profession and the conduct relevant to the offense of conviction; (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted; and (3) that the time frame and structure of the special condition is for the minimum time frame and to the minimum extent necessary to protect the public.}*

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment – Page 4 of 7

Defendant:    SANDIPKUMAR PATEL
Case Number:   2-Cr. 14-508 (1)

## STANDARD CONDITIONS OF SUPERVISED RELEASE

While the defendant is on supervised release pursuant to this Judgment:

1) The defendant shall not commit another federal, state, or local crime during the term of supervision.

2) The defendant shall not illegally possess a controlled substance.

3) If convicted of a felony offense, the defendant shall not possess a firearm or destructive device.

4) The defendant shall not leave the judicial district without the permission of the court or probation officer.

5) The defendant shall report to the probation officer in a manner and frequency directed by the Court or probation officer.

6) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

7) The defendant shall support his or her dependents and meet other family responsibilities.

8) The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.

9) The defendant shall notify the probation officer within seventy-two hours of any change in residence or employment.

10) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances.

11) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

12) The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.

13) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

14) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

15) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.

16) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

(17) You shall cooperate in the collection of DNA as directed by the Probation Officer.

*(This standard condition would apply when the current offense or a prior federal offense is either a felony, any offense under Chapter 109A of Title 18 (i.e., §§ 2241-2248, any crime of violence [as defined in 18 U.S.C. § 16], any attempt or conspiracy to commit the above, an offense under the Uniform Code of Military Justice for which a sentence of confinement of more than one year may be imposed, or any other offense under the Uniform Code that is comparable to a qualifying federal offense);*

(18) Upon request, you shall provide the U.S. Probation Office with full disclosure of your financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, you are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge

AO 245B (Mod. D/NJ 12/06) Sheet 3a - Supervised Release

Judgment – Page 5 of 7

Defendant:   SANDIPKUMAR PATEL
Case Number: 2-Cr. 14-508 (1)

and approval of the U.S. Probation Office. You shall cooperate with the Probation Officer in the investigation of your financial dealings and shall provide truthful monthly statements of your income.  You shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Office access to your financial information and records;

( 19)  As directed by the U.S. Probation Office, you shall participate in and complete any educational, vocational, cognitive or any other enrichment program offered by the U.S. Probation Office or any outside agency or establishment while under supervision;

( 20)  You shall not operate any motor vehicle without a valid driver's license issued by the State of New Jersey, or in the state in which you are supervised.  You shall comply with all motor vehicle laws and ordinances and must report all motor vehicle infractions (including any court appearances) within 72 hours to the U.S. Probation Office;

---

*For Official Use Only - - - U.S. Probation Office*

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions, and have been provided a copy of them.

You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

(Signed) _____

                                           Defendant                    Date

_____

         U.S. Probation Officer/Designated Witness        Date

AO 245B (Mod. D/NJ 12/06) Sheet 5 - Fine

Judgment – Page 6 of 7

Defendant:     SANDIPKUMAR PATEL
Case Number:   2-Cr. 14-508 (1)

## FINE

The defendant shall pay a fine of $50,000.00.

This fine, plus any interest pursuant to 18 U.S.C. § 3612(f)(1), is due immediately and shall be paid in full within 30 days of sentencing .On count 1, $30,000 and $20,000 on count 2

This amount is the total of the fines imposed on individual counts, as follows: $30,000 on count 1   and $20,000 on count 2

If the fine is not paid, the court may sentence the defendant to any sentence which might have been originally imposed. See 18 U.S.C. § 3614.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B (Mod. D/NJ 12/06) Sheet 6 - Restitution and Forfeiture

Defendant:     SANDIPKUMAR PATEL
Case Number:   2-Cr. 14-508 (1)

Judgment – Page 7 of 7

## RESTITUTION AND FORFEITURE

### RESTITUTION

The defendant shall make restitution in the amount of $423,452.00. Payments should be made payable to the **U.S. Treasury** and forwarded to the Clerk of the Court in Trenton, NJ, 402 East State Street, Rm 2020, Trenton, New Jersey 08608, for distribution to Internal Revenue Services, RAS-RACS,   ATTN:   Mail  Stop 6261, Criminal Restitution, 333 West Pershing Ave., Kansas City, Missouri 64108

The restitution is due immediately and shall be paid in full within 30 days of sentencing.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.